# EXHIBIT G

2 McCarthy on Trademarks and Unfair Competition § 11:4 (4th ed.)

McCarthy on Trademarks and Unfair Competition, Fourth Edition
December 2016 Update

J. Thomas McCarthy

Chapter 11. The Spectrum of Distinctiveness of Marks
I. INTRODUCTION TO THE SPECTRUM OF DISTINCTIVENESS

§ 11:4. Inherently distinctive marks

References

**West's Key Number Digest**

West's Key Number Digest, Trademarks 1033
West's Key Number Digest, Trademarks 1038
West's Key Number Digest, Trademarks 1039

***Inherently Distinctive Word Marks.*** Fanciful, arbitrary and suggestive words used as marks are regarded as being "inherently distinctive." [1] A "fanciful" mark is a word that is coined for the express purpose of functioning as a trademark. [2] It could also be any obscure or archaic term not familiar to buyers. An "arbitrary" mark is a word that is in common usage in the language, but is arbitrarily applied to the goods or services in question in such a way that it is does not even suggest some aspect of the goods or services. [3] A word that suggests, but does not directly describe, some aspect of the goods or services falls into the "suggestive" category and is inherently distinctive. [4] These categories of word marks are described in following sections.

***An Inherently Distinctive Designation is Deemed to Immediately Perform as a Trademark.*** Marks that are in the "inherently distinctive" category are regarded as capable of serving immediately upon use as a legally recognized symbol of origin—that is, as a "trademark." Inherently distinctive designations are given legal protection immediately upon first use as a mark. In a sense, they are irrefutably presumed to have achieved customer recognition as a symbol of origin immediately upon first use as a mark. As the U.S. Supreme Court commented: "The general rule regarding distinctiveness is clear: an identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." [5] An inherently distinctive designation is presumed to immediately serve as an identifier of source from the very first moment that it is used as a mark. [6] Such marks are given a relatively broad scope of judicial protection against infringement. [7]

***Secondary Meaning is Not Needed to Give Life to an Inherently Distinctive Mark.*** Immediately upon use, inherently distinctive marks are legally protectable without the need for proof of secondary meaning and can be registered immediately. As the Third Circuit observed of word marks: "[E]vidence of secondary meaning is not even relevant if the term is arbitrary, suggestive or generic." [8] Thus, as the Ninth Circuit remarked, if a designation such as trade dress is inherently distinctive, "the further requirement of a showing of secondary meaning would be superfluous" to the issue of validity. [9]

***Inherently Distinctive Non-Word Images and Designations.*** The spectrum of descriptive, suggestive, arbitrary and fanciful was created to categorize word marks. It is not suitable for non-word designations such as shapes and images and trade dress such as package and product design. [10] Whether such non-word designations are inherently distinctive or not must be judged by guidelines appropriate to the world of images and designs. [11]

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1 Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 120 L. Ed. 2d 615, 23 U.S.P.Q.2d 1081, 1084 (1992) ("The ... three categories of [suggestive, arbitrary and fanciful] marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."); Lahoti v. Vericheck, Inc., 636 F.3d 501, 505–506, 97 U.S.P.Q.2d 1878 (9th Cir. 2011) ("A suggestive mark is inherently distinctive, but a descriptive mark that lacks secondary meaning is not distinctive and is not entitled to trademark protection.").

2 *See* §§ 11:5 to 11:10.

3 *See* §§ 11:11 to 11:14.

4 *See* §§ 11:62 to 11:72.

5 Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769, 112 S. Ct. 2753, 2758, 120 L. Ed. 2d 615, 23 U.S.P.Q.2d 1081 (1992). *See* Taco Cabana Intern., Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1120 n.7, 19 U.S.P.Q.2d 1253 (5th Cir. 1991), aff'd, 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615, 23 U.S.P.Q.2d 1081 (1992) ("[T]he legal recognition of an inherently distinctive trademark or trade dress acknowledges the owner's legitimate proprietary interest in its unique and valuable informational device, regardless of whether substantial consumer association yet bestows the additional empirical protection of secondary meaning.").

6 *See* § 16:4. *See e.g.* Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 700, 131 U.S.P.Q. 55 (2d Cir. 1961) ("A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed to the goods and the goods are sold. ... Priority of user alone is controlling .... The presumption that a fanciful word or mark becomes distinctive and identifies the source of goods on which it is used immediately after adoption and bona fide first use is basic in trademark law.").

7 *See* § 11:83.

8 A.J. Canfield Co. v. Honickman, 808 F.2d 291, 297, 1 U.S.P.Q.2d 1364 (3d Cir. 1986). *See* Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162, 170, 18 U.S.P.Q.2d 1907 (2d Cir. 1991) (a finding that the shape of a hang tag on designer luggage is inherently distinctive "eliminates the trademark owner's need to prove secondary meaning"); Peoples Federal Sav. Bank v. People's United Bank, 672 F.3d 1, 5 n.6, 101 U.S.P.Q.2d 1663 (1st Cir. 2012) ("[Word marks] classified as suggestive, arbitrary or fanciful are considered inherently distinctive, whereas descriptive marks are tentatively considered non-distinctive and can only attain distinctive status 'upon an affirmative showing of secondary meaning.'").

9 Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 843, 4 U.S.P.Q.2d 1026 (9th Cir. 1987).

10 *See* discussion at § 8:13; *see e.g.* Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431, 1440, 32 U.S.P.Q.2d 1724, 1731 (3d Cir. 1994) ("[W]e do not think it helpful or proper to transplant the categorical distinctiveness enquiry developed for [word] trademarks to product configurations ...."); Amazing Spaces, Inc. v. Metro Mini Storage, 608 F.3d 225, 241, 95 U.S.P.Q.2d 1333 (5th Cir. 2010) ("As the district court discovered, the challenge of placing the Star Symbol into *Abercrombie's* constellation of [word mark] categories is a futile endeavor." Using the *Seabrook* test, the court affirmed that a five pointed star within a circle was not inherently distinctive.).

11 To determine if shapes and images composing trade dress are inherently distinctive, *see* discussion at § 8:13 (The test for inherently distinctive packaging trade dress.). Regarding pictures that describe goods or services, *see* § 7:36.

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2 McCarthy on Trademarks and Unfair Competition § 11:5 (4th ed.)

McCarthy on Trademarks and Unfair Competition, Fourth Edition
December 2016 Update

J. Thomas McCarthy

Chapter 11. The Spectrum of Distinctiveness of Marks
II. FANCIFUL AND ARBITRARY MARKS
A. FANCIFUL MARKS

## § 11:5. What is a "fanciful" mark?

References

**West's Key Number Digest**

West's Key Number Digest, Trademarks ⚷1039

"Fanciful" marks consist of "coined" words that have been invented or selected for the sole purpose of functioning as a trademark.[1] Such marks comprise words that are either totally unknown in the language or are completely out of common usage at the time, as with obsolete or scientific terms. The fact that lexicographers or devotees of antiquity may recognize the word is irrelevant to the fact that the word is totally unfamiliar to the ordinary consumer.[2]

If, in the process of selecting a new mark, a seller sits down and invents a totally new and unique combination of letters or symbols that results in a mark that has no prior use in the language, then the result is a "coined" or "fanciful" mark.

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1 *See* Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 146 U.S.P.Q. 566 (7th Cir. 1965).

2 Collyrium, Inc. v. John Wyeth & Bro., Inc., 167 Misc. 231, 3 N.Y.S.2d 42 (1938) (COLLYRIUM); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 94 U.S.P.Q. 363 (3d Cir. 1952) (TELECHRON); Le Blume Import Co. v. Coty, 293 F. 344 (2d Cir. 1923) (L'ORIGAN). *See* §§ 11:33 to 11:35.

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2 McCarthy on Trademarks and Unfair Competition § 12:7 (4th ed.)

McCarthy on Trademarks and Unfair Competition, Fourth Edition
December 2016 Update

J. Thomas McCarthy

Chapter 12. Generic Terms
II. TEST OF GENERICNESS

## § 12:7. Principal generic significance—Rise and fall of the purchaser motivation test

References

**West's Key Number Digest**

**West's Key Number Digest, Trademarks 🔑1034**

***The Ninth Circuit's "Purchaser Motivation" Test for Genericness.*** A gratuitous dictum in the Ninth Circuit's 1982 "Monopoly" decision was put forth to the effect that a term is generic unless a majority of customers are motivated to buy the product because they know the trade name of the company that produces the product and like the products of that company. [1] This bizarre and aberrational view was outside the mainstream of trademark law, which only requires that a trademark identify a single, albeit *anonymous* source. [2] As Judge Nies observed, such questioning of buyer motivation and knowledge of the seller's name was:

> [A]n esoteric and extraneous enquiry focusing on what motivates the purchasing public to buy particular goods, the product itself or the source. ... The reason the public is motivated to buy the product, whether because of quality, particular features, source, pleasing design, association with other goods, price, durability, taste, or prestige of ownership, is of concern to market researchers but is legally immaterial to the issue of whether a particular designation is generic. [3]

***Congress Bans the "Purchaser Motivation" Test.*** It took an Act of Congress to put an end to the Ninth Circuit's purchaser motivation test for genericness. In 1984, the Lanham Act was amended to codify the primary significance test as the one and only test of genericness. [4] The amendments preclude finding generic status solely because a mark is used to identify a "unique" product or service; preclude use of a "purchaser motivation" test for genericness and abandonment; and codify the traditional rule that a mark can indicate a single, albeit "unknown" source. [5]

***The 1984 Amendments Codify the "Primary Significance" Test.*** Section 14(3) of the Lanham Act was amended to include the following sentence:

> The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used. [5.1]

Similarly, the statutory definition of "abandonment" was amended to include the sentence stating that: "Purchaser motivation shall not be a test for determining abandonment under this paragraph." [6]

The New Jersey Supreme Court has noted that the 1984 Trademark Clarification Act was designed to repudiate the "motivation" test of the *Anti-Monopoly* decision and to make clear that marks may distinguish unique products and products whose source is unknown:

> These amendments were not intended to change existing trademark law. Among the many doctrines left securely in place was the basic principle that no producer may usurp a generic term. ... The legislation recognized that there are two types of generic words or terms: those that are inherently generic, and those that originated as trademarks but through usage suffered the loss of

> their distinctive sense, characteristic, or meaning. ... The [1984] Lanham Act amendments dealt only with the latter. [7]

The Federal Circuit has stated that the 1984 amendments codified Judge Learned Hand's "time-honored test for genericness" and dictates that primary significance to actual or potential purchasers of the goods or services is the appropriate test. [8] Thus, it is clear that the 1984 amendments require use of the primary significance test. [9]

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1 Anti-Monopoly, Inc. v. General Mills Fun Group, 684 F.2d 1316, 216 U.S.P.Q. 588 (9th Cir. 1982), cert. denied, 459 U.S. 1227, 75 L. Ed. 2d 468, 103 S. Ct. 1234 (1983), where, in a test survey, people were asked "Would you buy Tide primarily because you like Procter and Gamble's products or primarily because you like Tide detergent?" Sixty-eight percent indicated the latter reason, from which the court implied that "Procter and Gamble might have cause for alarm" because this indicated that the public regards "Tide" as the name of a particular detergent, rather than as one producer's brand name. *See* criticism of this "reasoning" in Greenbaum, Ginsburg & Weinberg, "A Proposal for Evaluating Genericism after 'Anti-Monopoly,'" 73 Trademark Rep. 101 (1983); Hewitt & Krieger, "Anti-Monopoly: An Autopsy for Trademarks," 11 A.P.L.A. J. 151 (1983); Comment, "Primary Significance: Proving the Consumer's Perception," 14 Seton Hall L. Rev. 315 (1984) (An excellent review of the law, focusing upon the problems of separating trademark from generic significance where there is only one seller of the product. Criticizes *Anti-Monopoly*, concluding that "the motivation survey is not at all probative of primary significance.").

2 *See, e.g.*, Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 136 U.S.P.Q. 508 (9th Cir. 1963), cert. denied, 374 U.S. 830, 10 L. Ed. 2d 1053, 83 S. Ct. 1870, 137 U.S.P.Q. 913 (1963) (a buyer "would probably not concern himself about any such detail" as the name of the firm that sells a brand name product). *See* authorities cited at §§ 3:7, 3:9, 15:8.

3 In re DC Comics, Inc., 689 F.2d 1042, 215 U.S.P.Q. 394 (C.C.P.A. 1982) (Nies, J. concurring). *See* Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327 (2d Cir. 1983) (agreeing with Judge Nies' views quoted in text, Second Circuit stated that in determining existence of secondary meaning the actual purchasing motivation of consumers "is essentially irrelevant").

4 The Trademark Clarification Act of 1984. Pub. L. 98-620, 98 Stat. 3335, enacted Nov. 8, 1984. The Act amended sections 14(c) and 45 to repudiate the "consumer motivation" test of genericness of the Ninth Circuit *Anti-Monopoly* case and to make it clear that marks may distinguish unique products and products whose source is unknown by name to customers.

5 *See* A.J. Canfield Co. v. Honickman, 808 F.2d 291, 1 U.S.P.Q.2d 1364 (3d Cir. 1986) (the 1984 amendments codified the "primary significance test" as the rule for determining genericness); Palladino, "Genericness and the Trademark Clarification Act of 1984: Five Years Later," 79 Trademark Rep. 657 (1989).

5.1 Lanham Act § 14(3), 15 U.S.C.A § 1064(3).

6 Lanham Act § 45, 15 U.S.C.A. § 1127.

7 Christian Science Bd. of Directors of First Church of Christ, Scientist v. Evans, 105 N.J. 297, 520 A.2d 1347, 2 U.S.P.Q.2d 1093 (1987) (the 1984 amendments do not preclude the court from finding that "Christian Science" is a generic name of any religion that follows the teachings of Mary Baker Eddy).

8 Magic Wand, Inc. v. RDB, Inc., 940 F.2d 638, 19 U.S.P.Q.2d 1551 (Fed. Cir. 1991) ("[T]he 1984 amendment makes the test for genericness the primary significance of the mark to the relevant public limited to actual or potential purchasers of the goods or services."). *See* the Learned Hand test at § 12:4.

9 Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 26 U.S.P.Q.2d 1044, 1049 (3d Cir. 1993) ("[B]oth Congressional mandate and this court's precedent direct that we employ the primary significance test."); Genesee Brewing Co. v. Stroh Brewing Co., 124 F. 3d 137, 43 U.S.P.Q.2d 1734 (2d Cir. 1997) ("The 'primary significance test' is the law of the land; it was adopted by the Supreme Court in Kellog Co. v. National Biscuit Co. ... and subsequently codified by Congress ... in 1984.").

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2 McCarthy on Trademarks and Unfair Competition § 15:8 (4th ed.)

McCarthy on Trademarks and Unfair Competition, Fourth Edition
December 2016 Update

J. Thomas McCarthy

Chapter 15. Secondary Meaning
I. ACQUIRING TRADEMARK SIGNIFICANCE THROUGH SECONDARY MEANING
C. SECONDARY MEANING: WHAT IT IS

§ 15:8. Association with a single, though anonymous, source

References

**West's Key Number Digest**

West's Key Number Digest, Trademarks 🔑1032
West's Key Number Digest, Trade Regulation 🔑524

***Secondary Meaning Does Not Require that the Relevant Purchasing Public Know the Identity of the Single Source Denoted by the Mark.*** Care must be taken in reading the judicial opinions that state that secondary meaning denotes the buyer's mental association between the designation and a single source. This does not mean that the buyer must know the identity of that "single source" in the sense that she knows the corporate name of the producer or seller. In fact, few buyers know, or care about, the corporate identity of the seller of a trademarked product. With diversification, many well-known consumer brands are owned by companies whose names are not known to the vast majority of the public. [1] The buyer who associates a designation with a single source need not know the corporate or personal name of that source. When the buyer sees any related product with that mark, she is entitled to assume that it comes from the same anonymous source as every other related product so marked. The Ninth Circuit observed that few buyers of consumer products know the name of the maker of a brand they recognize. In that case the owners of the mark BLACK & WHITE for Scotch whiskey sued the seller of BLACK & WHITE beer:

> Of course there may not be one in a hundred buyers who knows that it is made by Buchanan or wholesaled by Fleischmann. Probably all that such buyers know is that BLACK & WHITE Scotch whiskey has satisfied them in the past or that they have heard of it and the average purchaser would no doubt select for the use of his guests something with which he was familiar and thus purchase BLACK & WHITE Whiskey. [2]

The term "single source" is modified to mean a "single, though anonymous source." As the Restatement observes: "Trademarks serve as a means of communication between otherwise unknown or anonymous producers and their prospective customers." [3] The anonymous source rule was codified into federal law in the 1984 amendments to the Lanham Act definitions of "trademark" and "service mark." [4]

***All Courts Follow the "Single, Albeit Anonymous" Rule.*** All courts agree that secondary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source. [5]

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1 For example, what parent company owns these well-known consumer product marks: (1) QUAKER OATS cereal? (2) MINUTE MAID orange juice? (3) GERBER baby food? (4) CREST toothpaste? (5) TYLENOL analgesic? (6) BEN &

JERRY'S ice cream? (7) DONNA KARAN fashions? (8) MONTBLANC pens? (9) ROLLS-ROYCE luxury cars? (10) JEEP vehicles?

*Answers:* (1) PepsiCo (2) Coca-Cola (3) Nestle (4) Procter & Gamble (5) Johnson & Johnson (6) Unilever (7) LVMH Louis Vuitton (8) Richemont (9) BMW (10) Fiat Chrysler.

2 Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 155, 136 U.S.P.Q. 508 (9th Cir. 1963), cert. denied, 374 U.S. 830, 10 L. Ed. 2d 1053, 83 S. Ct. 1870, 137 U.S.P.Q. 913 (1963) (Finding a likelihood of confusion.).

3 Restatement Third, Unfair Competition § 9, comment c (1995).

4 Lanham Act § 45, 15 U.S.C.A. § 1127 ("The term "**trademark**" includes any word, name, symbol, or device, or any combination thereof—(1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the **source** of the goods, *even if that* ***source*** *is* ***unknown***. Emphasis added.). *See* A.J. Canfield Co. v. Honickman, 808 F.2d 291, 300, 1 U.S.P.Q.2d 1364 (3d Cir. 1986) ("The [1984] Clarification Act endorsed the long-recognized anonymous **source** rule, ... which recognizes that a term may function as an indicator of **source** and therefore as a valid **trademark**, even though consumers may not know the name of the manufacturer or producer of the product."). See § 3:9.

5 **Supreme Court**—Coca-Cola Co. v. Koke Co. of America, 254 U.S. 143, 41 S. Ct. 113, 65 L. Ed. 189 (1920) (The **trademark** COCA-COLA denotes a "single thing coming from a single **source**").

**First Circuit**—Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 32, 9 U.S.P.Q.2d 1690 (1st Cir. 1989) ("Whether or not purchasers happen to know that the sponsor of the Boston Marathon is an organization called the "Boston Athletic Association" is irrelevant ... See 15 U.S.C.A. § 1127, as amended (defining "service mark" as a mark 'indicat[ing] the **source** of the services, even if that **source** is **unknown**.'").

**Second Circuit**—Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960, 963 (C.C.A. 2d Cir. 1918) ("The plaintiff has at least shown that the public has become accustomed to regard its familiar wheat biscuit as emanating, if not from it by name, at least from a single, though anonymous, maker...."); California Apparel Creators v. Wieder of Cal., 162 F.2d 893, 897, 74 U.S.P.Q. 221, 174 A.L.R. 481 (C.C.A. 2d Cir. 1947) ("Hence we find the rule so often stated that to establish such a secondary meaning, while it is not necessary to show that the public has become conscious of the personal identity of the manufacturer, yet it must be shown that whatever is asserted to carry the secondary meaning has come to signify origin from a single, though anonymous, **source**."); Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1221, 4 U.S.P.Q.2d 1541 (2d Cir. 1987) ("[S]omeone seeking to establish secondary meaning must show that the purchasing public associates goods designated by a particular mark with but a single-although anonymous-**source**.").

**Third Circuit**—Premier Dental Products Co. v. Darby Dental Supply Co., Inc., 794 F.2d 850, 7 Int'l Trade Rep. (BNA) 2617, 230 U.S.P.Q. 233 (3d Cir. 1986) ("It is enough 'if the article be known as coming from a single, though anonymous **source**.'"); A.J. Canfield Co. v. Honickman, 808 F.2d 291, 1 U.S.P.Q.2d 1364 (3d Cir. 1986) (Under the anonymous **source** rule, now codified in the Lanham Act "a term may function as an indicator of **source** and therefore as a valid **trademark**, even though consumers may not know the name of the manufacturer or producer of the product.").

**Fourth Circuit**—M. Kramer Mfg. Co., Inc. v. Andrews, 783 F.2d 421, 228 U.S.P.Q. 705 (4th Cir. 1986) ("The public need not be able to identify the name of the manufacturer that produces the product; it is enough if the public perceives that the product emanates from a single **source**.").

**Fifth Circuit**—Natural Polymer International Corp., V.S & M Nutec, L.L.C, 2004 WL 912568, *6 (N.D. Tex. 2004) ("All that is necessary to establish secondary meaning is that the ordinary buyer associates the mark with a single, albeit anonymous, **source**." Quoting treatise.); Board of Supervisors of LA State University v. Smack Apparel Co., 438 F. Supp. 2d 653, 656, 211 Ed. Law Rep. 809, 82 U.S.P.Q.2d 1122 (E.D. La. 2006), aff'd, 550 F.3d 465, 239 Ed. Law Rep. 874, 89 U.S.P.Q.2d 1338 (5th Cir. 2008) ("[T]he buyer, to be deceived, must be looking for some symbol which he thinks identifies a single, albeit anonymous, **source**. Without that identification, called 'secondary meaning' for non-inherently distinctive terms, there can be no confusion.").

**Sixth Circuit**—Tas-T-Nut Co. v. Variety Nut & Date Co., 245 F.2d 3, 7, 113 U.S.P.Q. 493 (6th Cir. 1957) ("To prove secondary meaning in a trade dress, it was not necessary to show that the public knew the personal identity of the appellant."); Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 315 n.7, 60 U.S.P.Q.2d 1633, 2001-2 Trade Cas. (CCH) ¶73489 (6th Cir. 2001) ("While the law allows secondary meaning to be established by demonstrating that the public is aware that the product comes from an anonymous **source**, there must be evidence indicating that it is a single, anonymous **source**.").

**Seventh Circuit**—Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 381, 188 U.S.P.Q. 623, 1976-1 Trade Cas. (CCH) ¶60790 (7th Cir. 1976) ("While perhaps not many know that Carbide is the manufacturer of EVEREADY products, few would have any doubt that the term was being utilized other than to indicate the single, though anonymous, **source**.").

**Eighth Circuit**—Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 34 U.S.P.Q.2d 1428, 1434 (8th Cir. 1995) (to prove secondary meaning in alleged trade dress, plaintiff need not prove that consumers know the name of the plaintiff company; "the showing required is that consumers associate the trade dress with a single **source**").

**Ninth Circuit**—Maljack Productions, Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 887, 38 U.S.P.Q.2d 1478 (9th Cir. 1996) ("When a movie is not in the public domain, a showing of secondary meaning only requires proof that the public associates the movie title with a single **source**, even if that **source** is anonymous.").

**Tenth Circuit**—Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 940, 221 U.S.P.Q. 209 (10th Cir. 1983) ("To establish a secondary meaning, it is not necessary to show that the public is aware of the name of the manufacturer of a product; it is sufficient if the public is aware that the product comes from a single, though anonymous, **source**.").

**Eleventh Circuit**—AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1536 n.14, 1 U.S.P.Q.2d 1161 (11th Cir. 1986) ("Secondary meaning is the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or **unknown**.").

**Federal Circuit**—In re Polar Music Intern. AB, 714 F.2d 1567, 1571, 221 U.S.P.Q. 315 (Fed. Cir. 1983) ("[T]he public need not know the name of the owner of the mark"); Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 1205, 31 U.S.P.Q.2d 1321, 1331 (Fed. Cir. 1994) ("[W]e hold that a genuine issue of material fact exists-whether the relevant consumers associated the shape and appearance of the container with a single albeit anonymous manufacturing **source** ....").

**Trademark Board**—Nextel Communications, Inc. v. Motorola, Inc., 91 U.S.P.Q.2d 1393, 2009 WL 1719598 (T.T.A.B. 2009) ("The anonymous **source** rule essentially states that a consumer need not know the identity of the manufacturer of goods or the provider of services, and that all that is necessary to establish secondary meaning is that the consumer associates the proposed mark with a single **source**.").

**California**—North Carolina Dairy Foundation, Inc. v. Foremost-Mackesson, Inc., 92 Cal. App. 3d 98, 108, 154 Cal. Rptr. 794, 203 U.S.P.Q. 1012 (1st Dist. 1979) ("Such '**source**' identification does not, however, mean that the buyer must actually know the name of the **source** but only that the buyer directly associate the mark with but one, though, anonymous, **source**.").

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

3 McCarthy on **Trademarks** and Unfair Competition § 17:17 (4th ed.)

McCarthy on **Trademarks** and Unfair Competition, Fourth Edition
December 2016 Update

J. Thomas McCarthy

Chapter 17. Loss of **Trademark** Rights
III. **Abandonment** through Nonuse of Mark

# § 17:17. "Abandonment" by failure to prosecute infringers

References

**West's Key Number Digest**

West's Key Number Digest, **Trademarks** ⚷1156

***Uncertainty in the Case Law.*** There is a great deal of imprecise talk in the case law as to the impact, if any, of plaintiff's failure to sue third-party infringers. While many defendants, and some courts, talk about such a failure to sue in terms of "**abandonment**,"[1] other courts state with vigor that the failure to sue others is totally irrelevant.[2] The truth lies somewhere in between.

***The "Irrelevant" Position.*** The rationale often given in support of the "irrelevant" position is that "the existence of other infringers is irrelevant [because] a defendant cannot rely upon the wrongdoing of others to exculpate itself from its own infringing activities."[3] This point of view has much common sense to support it. No one should be allowed to continue illegal conduct of confusing the public just because someone else is doing it too. But this assumes that the case of infringement has already been proven and that failure to prosecute, and its possible impact on customer perception, is irrelevant to the issue of likelihood of confusion. Some courts change the focus slightly by noting that "A **trademark** owner is not bound to take on more than one infringer at a time,"[4] or that a **trademark** owner is not obligated to "police every conceivable related use ... in order to protect a definable area of primary importance."[5]

***The "Abandonment" Position.*** At this point, it is important to recognize what is not involved. The defense discussed here is a failure to sue others, not a long failure to sue *this* defendant. The latter is the defense of laches. That is, a long delay in instituting suit against this defendant, which causes prejudice, may constitute laches or acquiescence.[6] However, laches is not the same as "**abandonment**." Laches or acquiescence is a personal defense, while **abandonment** is a loss of rights as against the whole world. Failure to sue others does not constitute a laches defense.[6.50] Some uses of the word "**abandonment**" in the context of failure to sue appear merely to be a bit of rhetorical hyperbole when a court is really discussing laches.[7]

One discrete line of cases talks in terms of "**abandonment**" when a **trademark** owner (or ex-owner) has failed to sue infringers for so long that the "mark" has been used by competitors and customers as the generic name of an article, no matter who makes it. In holding that the word HUNYADI had become the generic name in the United States for a type of Hungarian mineral water, the Supreme Court observed that:

> She [plaintiff] has failed in this particular. By twenty years of inaction she has permitted the use of the word by numerous other importers and it is now too late to resuscitate her original title.[8]

A related line of cases speaks of "intent to **abandon**" in the context of the failure of a **trademark** owner during a long period to assert or enforce its rights against descriptive use by others such that the mark no longer indicates origin in one seller.[9]

However, the focus in the generic and descriptive cases is not primarily on how often plaintiff has sued or not sued others, but rather, what has been the effect of not suing upon use of the term by competitors, and hence, upon use

 © 2016 Thomson Reuters. No claim to original U.S. Government Works. 

by customers. Lack of prosecution is an omission that may, or may not, have led to widespread customer usage of the term in a nontrademark sense.

***The "Loss of Strength" Position.*** With this, we are left with the run-of-the-mill trademark litigation in which defendant points to competitors who are using the same term as is defendant, but have not been sued by plaintiff. What is the significance of such an alleged failure to prosecute? If the argument is couched in terms of alleged "abandonment," it is far from the mark. Such an argument is no more persuasive than that of the drunken driver who pleads to be let off because there are "lots of other drunk drivers on the road—why pick on me?" This is not a "defense," nor should it be. Rather, it appears that the only relevancy of failure to prosecute others is as to the possible impact such failure may have on the strength of the plaintiff's mark. [10] It is possible that plaintiff's mark has been "weakened" by widespread use in the market and that such use resulted from plaintiff's failure to sue infringers. That is, the only way to prevent a market from becoming "crowded" with similar marks is a program of assertive enforcement. [11] Chief Judge Nies recognized that when failure to prosecute is raised, the issue is usually not one of "abandonment." Only when *all* rights of protection are lost is there an abandonment. [12] Typically, the issue is not "abandonment," but possible loss of strength by widespread use of similar marks by competitors. As Chief Judge Nies accurately observed:

> Without question, distinctiveness can be lost by failing to take action against infringers. If there are numerous products in the marketplace bearing the alleged mark, purchasers may learn to ignore the "mark" as a source identification. When that occurs, the conduct of the former owner, by failing to police its mark, can be said to have caused the mark to lose its significance as a mark. However, an owner is not required to act immediately against every possible infringing use to avoid a holding of abandonment. [13]

Of course, if, through failure to prosecute, a mark continually loses "strength" and "distinctiveness," it will eventually hemorrhage so much that it dies as a mark. That would be "abandonment" through acts of omission. [14] However, such a death by a thousand blows would probably result in the mark merely having a descriptive or generic significance to customers. Thus, we are brought back to the generic and descriptive line of cases. In such cases, the question is not really one of "abandonment," but of the generic or descriptive significance of the term to customers. In such cases, failure to prosecute is only a small part of the total enquiry.

***Author's View: The Issue is "Loss of Strength."*** In the typical trademark litigation, the relevance of failure to prosecute others is not to "abandonment," but to "strength." [15] The issue is hardly ever "abandonment," because that requires proof that the mark has lost *all* significance as an indication of origin. That is, the mark is completely without signs of life. The only relevance in the typical case of failure to prosecute others is as to the element of strength of the mark. That is, the mark is so crowded in by similar marks used by competitors that the mark is alive, but weakened. [16]

The Sixth Circuit, adopting the analysis of this treatise, said that while a failure to prosecute is usually only applicable to weaken the strength of the alleged mark, in an extreme case, abandonment is always a possibility. The court remanded to the district court to consider the degree to which 40 years of nonenforcement of alleged trade dress in an "Eames" chair design, in the face of hundreds of imitators, served to so weaken any protectable right to the point where no secondary meaning or likelihood of confusion existed as to the manufacturing source of the chair. A complete abandonment remained open as a possible conclusion:

> Although it appears unlikely that failure to prosecute, by itself, can establish that trade dress has been abandoned, it is possible that, in extreme circumstances, failure to prosecute may cause trade dress rights to be extinguished by causing a mark to lose its significance as an indication of source. [17]

However, the relevance of failure to prosecute to the strength question is a tenuous one. The primary focus is upon third-party use and customer perception, with failure to prosecute being only an explanation of how this market became so crowded with similar marks. The Trademark Board has pointed out the "line to be drawn" between the "insufficient defense" that plaintiff has failed to object to third-party uses and registrations and the "proper defense" that numerous third-party uses of similar marks tends to weaken the scope of plaintiff's mark. [18]

Accordingly, since failure to sue third-party infringers is relevant to "**abandonment**" only when the failure causes the mark to lose all **trademark** significance, it is error to instruct jury that if it found that plaintiff knowingly tolerated others' use of the mark, then the jury must find **abandonment**. [19] As one court observed:

> The owner of a mark is not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of his shotgun instantly upon spotting a possible infringer. ... [D]efendants have not proved that because of the lack of efforts by plaintiffs in "policing" use of the mark, that [the mark] has become so diluted by **widespread** use by others that it has lost its distinctiveness. [20]

Hence, while failure to enforce against third parties may have some weakening effect on the mark, "where the owner of the mark has been reasonably diligent in protecting his rights, even though infringements exist, no intent to **abandon** will be inferred." [21] A **trademark** owner is not required to act against every infringing use no matter how inconsequential at risk of losing rights in the mark. [22] It is reasonable for the **trademark** owner to object only to those third-party uses which it believes would conflict with its mark while not objecting to other third-party uses. [23] Failure to enforce an alleged mark or trade dress against third-party users for a long period of time may undercut the ability to prove irreparable injury, an essential element of a preliminary injunction. [24]

Westlaw. © 2016 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

1 Ritz Associates, Inc. v. Ritz-Carlton Hotel Co., 35 Misc. 2d 425, 230 N.Y.S.2d 408, 411, 134 U.S.P.Q. 86 (Sup 1962), judgment aff'd, 19 A.D.2d 522, 240 N.Y.S.2d 439, 138 U.S.P.Q. 404 (1st Dep't 1963), judgment aff'd, 14 N.Y.2d 670, 249 N.Y.S.2d 873, 198 N.E.2d 905, 141 U.S.P.Q. 757 (1964) (**Abandonment** from "the **widespread** use of the word 'Ritz' by numerous establishments, in this city and elsewhere, unconnected with defendant."); Uncas Mfg. Co. v. Clark & Coombs Co., 309 F.2d 818, 820, 135 U.S.P.Q. 282 (1st Cir. 1962) (where **abandonment** by nonuse is unclear, failure to prosecute infringers is evidence of **abandonment**).

2 U. S. Jaycees v. San Francisco Jr. Chamber of Commerce, 354 F. Supp. 61, 73, 175 U.S.P.Q. 525 (N.D. Cal. 1972), judgment aff'd, 513 F.2d 1226, 185 U.S.P.Q. 257 (9th Cir. 1975) ("Numerous cases have rejected this defense, holding that the existence of infringers other than the defendant was irrelevant to a determination of whether the defendant should be enjoined from continuing in its infringement of plaintiffs' **trademarks** and in its unfair competition."); Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc., 428 F. Supp. 689, 696, 193 U.S.P.Q. 35 (N.D. Ga. 1976) (The "mere fact that others may have intruded on a **trademark**, without more, does not necessarily preclude the plaintiffs' right to recovery."); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1181, 6 U.S.P.Q.2d 2034 (9th Cir. 1988) (Discovery that would reveal other potential infringers is not needed because evidence uncovered "would be irrelevant under the law of this circuit and of California."); STX, Inc. v. Bauer USA, Inc., 43 U.S.P.Q.2d 1492, 1502, 1997 WL 337578 (N.D. Cal. 1997) ("[E]vidence of other potential infringers is 'irrelevant' to a suit against a particular infringer.").

3 Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc., 200 U.S.P.Q. 282 (S.D. Fla. 1978).

4 Cuban Cigar Brands N. V. v. Upmann International, Inc., 457 F. Supp. 1090, 199 U.S.P.Q. 193 (S.D.N.Y. 1978), aff'd without op., 607 F.2d 995 (2d Cir. 1979) (stated in the context of laches).

5 Playboy Enterprises, Inc. v. Chuckleberry Pub., Inc., 486 F. Supp. 414, 422–423, 206 U.S.P.Q. 70 (S.D. N.Y. 1980). *See* discussion of small-scale local infringements at §§ 23:2, 25:56.

6 *See* §§ 31:41 to 31:43. *See* Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 214 U.S.P.Q. 327 (C.C.P.A. 1982) (distinguishing "**abandonment**" from "acquiescence").

6.50 *See* § 31:43.

7 *See, e.g.,* Johanna Farms, Inc. v. Citrus Bowl, Inc., 468 F. Supp. 866, 878, 199 U.S.P.Q. 16 (E.D.N.Y. 1978).

8 Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 37, 45 L. Ed. 60, 21 S. Ct. 7 (1900); *accord* French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, 48 L. Ed. 247, 24 S. Ct. 145 (1903); Saxlehner v. Wagner, 216 U.S. 375, 54 L. Ed. 525, 30 S. Ct. 298 (1910). *See* §§ 12:26 to 12:29.

9 *See, e.g.,* McKesson & Robbins, Inc. v. Charles H. Phillips Chemical Co., 53 F.2d 342, 345 (2d Cir. 1931), modified, 53 F.2d 1011 (2d Cir. 1931), cert. denied, 285 U.S. 552, 76 L. Ed. 942, 52 S. Ct. 407 (1932) ("Milk of Magnesia"); Ideal Industries,

Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 204 U.S.P.Q. 177 (7th Cir. 1979), cert. denied, 447 U.S. 924, 65 L. Ed. 2d 1116, 100 S. Ct. 3016, 206 U.S.P.Q. 864 (1980) (failure to object to third party's descriptive use: in "fairness," defendant should not be enjoined from a similar use). *See* § 11:69.

10 *See* §§ 11:85 to 11:87.

11 *See* discussion at §§ 11:85 to 11:87 regarding "strength" and the need for assertive enforcement of **trademark** rights.

12 Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 214 U.S.P.Q. 327 (C.C.P.A. 1982). *Accord*: Leatherwood Scopes v. James M. Leatherwood, 63 U.S.P.Q.2d 1699, 2002 WL 257394 (T.T.A.B. 2002) (**abandonment** occurs only when the mark has lost all capacity as a source indicator).

13 Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp., 680 F.2d 755, 214 U.S.P.Q. 327 (C.C.P.A. 1982). The court noted that such a requirement would "unnecessarily clutter the courts," a point also made in Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., 486 F. Supp. 414, 206 U.S.P.Q. 70 (S.D.N.Y. 1980), aff'd, 687 F.2d 563, 215 U.S.P.Q. 662 (2d Cir. 1982) ("Needlessly reducing noncompeting commercial activity and encouraging litigation.").

14 *See* Lanham Act § 45, 15 U.S.C.A. § 1127 ("**Abandonment**" includes "when any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.").

15 University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535, n.27, 225 U.S.P.Q. 1122 (11th Cir. 1985) (the "proper inquiry" is whether unauthorized third-party uses weaken the mark in the public mind); Boo, Inc. v. Boo.com Group Ltd., 62 U.S.P.Q.2d 1603, 2002 WL 334417 (D. Minn. 2002) (Even if ceasing doing business under the mark does not constitute "**abandonment**," it can so weaken the mark that few other uses will create a likelihood of confusion. Summary judgment for defendant.).

16 *See* discussion of strength at §§ 11:85 to 11:87.

17 Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 60 U.S.P.Q.2d 1633 (6th Cir. 2001).

18 Angelica Corp. v. Collins & Aikman Corp., 192 U.S.P.Q. 387, 1976 Wl 21136 (T.T.A.B. 1976). *See* Pillsbury Co. v. Milky Way Productions, Inc., 215 U.S.P.Q. 124, 1981 WL 1402 (N.D. Ga. 1981) (while failure to contest all infringing use does not itself preclude plaintiff, such uses may dilute the scope of strength of plaintiff's mark); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 205 U.S.P.Q. 969 (5th Cir. 1980), cert. denied, 449 U.S. 899, 66 L. Ed. 2d 129, 101 S. Ct. 268, 208 U.S.P.Q. 464 (1980) (lack of enforcement resulted in narrowing of DOMINO mark to the sugar field); §§ 11:88 to 11:90.

19 Sweetheart Plastics, Inc. v. Detroit Forming, Inc., 743 F.2d 1039, 223 U.S.P.Q. 1291 (4th Cir. 1984) (quoting and approving of the view taken in this treatise). *See* Board of Governors of University of North Carolina v. Helpingstine, 714 F. Supp. 167, 11 U.S.P.Q.2d 1506 (M.D.N.C. 1989) (following the *Sweetheart Plastics* case, held that failure to prosecute substantial uncontrolled use of the marks of a university from its founding in 1795 until 1982 did not result in **abandonment** because the marks did not lose all significance as indications of origin); University Book Store v. University of Wis. Bd. of Regents, 33 U.S.P.Q.2d 1385, 1392 (T.T.A.B. 1994) (there was no **abandonment** of mark of college mascot by informal, implied, royalty-free licenses granted by college to nearby book stores to sell merchandise with mascot on it).

20 Engineered Mechanical Services, Inc. v. Applied Mechanical Technology, Inc., 584 F. Supp. 1149, 223 U.S.P.Q. 324 (M.D. La. 1984). *Accord* Cullman Ventures, Inc. v. Columbian Art Works, Inc., 717 F. Supp. 96, 13 U.S.P.Q.2d 1257 (S.D.N.Y. 1989), later proceeding, 13 U.S.P.Q.2d 1904 (S.D.N.Y. 1989) (to maintain the strength of a mark, it is not necessary that the **trademark** owner act against every infringing use).

21 Quality Inns Int'l v. McDonald's Corp., 695 F. Supp. 198, 8 U.S.P.Q.2d 1633 (D. Md. 1988).

22 Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L., 673 F. Supp. 1238, 5 U.S.P.Q.2d 1305 (S.D.N.Y. 1987), supplemental op., 677 F. Supp. 144, 6 U.S.P.Q.2d 1571 (S.D.N.Y. 1987).

23 McDonald's Corp. v. McKinley, 13 U.S.P.Q.2d 1895 (T.T.A.B. 1989); Chicago Bears Football Club, Inc. v. 12th Man/ Tennessee LLC, 83 U.S.P.Q.2d 1073, 2007 WL 683778 (T.T.A.B. 2007) (The fact that the CHICAGO BEARS did not sue fan Web sites that used its name had no relevance to its opposition to registration of the mark 12th BEAR for fan jewelry, clothing, and the like. A likelihood of confusion was found.).

24 Warner-Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 12 U.S.P.Q.2d 1884, 1887 (D.N.J. 1989) (Failure of plaintiff to take action for six years against third-party users of its trade dress weakens its claim of irreparable injury. "This conscious inattention on the part of [plaintiff] towards private label brands that have virtually the same trade dress as [defendant's] brand severely undercuts plaintiff's claim that it creates irreparable damage." Preliminary injunction denied.).

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.