UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AU SABLE RIVER TRADING POST, LLC,

Plaintiff, Case No. 16-cv-11207

v. Honorable Thomas L. Ludington

DOVETAIL SOLUTIONS, INC., and
TAWAS AREA CHAMBER OF COMMERCE,

Defendants.
_______________________________________/

**OPINION AND ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND REMANDING TO STATE COURT**

For the past several decades, a winter festival known as "Perchville" has been held in Tawas, Michigan. Prior to Perchville 2016, Plaintiff Au Sable River Trading Post, LLC, ("the Trading Post") designed and created a number of Perchville-themed t-shirts which it intended to sell to local stores. Defendant Tawas Area Chamber of Commerce ("Chamber"), which is managed by Defendant Dovetail Solutions, Inc. ("Dovetail"), has registered a trademark for the term "Perchville" with the United States Patent and Trademark Office. Upon hearing that Au Sable was selling unauthorized "Perchville" t-shirts, the Chamber sought and obtained a permanent injunction to prevent Salvatore Agnello, an employee of the Trading Post, from selling the shirts. The Trading Post now brings this suit for declaratory judgment on the question of whether Defendants hold a trademark for the word "Perchville," and seeks damages for business defamation and tortious interference with a contract or business relationship. ECF No. 1. The parties have filed cross motions for summary judgment. ECF Nos. 13, 14, 15. For the reasons stated below, Defendants' motions will be granted in part, Plaintiff's motion will be denied, and Plaintiff's complaint will be dismissed in part and remanded.

**I.**

The Tawas Chamber of Commerce is a non-profit Michigan corporation dedicated to promoting local businesses. Dovetail Solutions, Inc., is a for-profit corporation which has a contract to "oversee the day-to-day operations and . . . management of the Chamber of Commerce." Buresh Dep. at 6, ECF No. 14, Ex. 4. The Au Sable River Trading Post is a wholesale provider of miscellaneous products, including mugs, banners, t-shirts, sweatshirts, key chains, swimsuits, skateboards, and similar items. Cruse Dep. at 19–21, ECF. No. 14, Ex. 12.

Since at least the 1960s, a winter festival known as "Perchville" has been held in the Tawas, Michigan, area. Thornton Dep. at 8–9, ECF No. 13, Ex. A. Originally, the idea to hold the festival was conceived of by a local businessman, Harold Gould. *Id.* at 8. The parties dispute whether the Tawas Chamber of Commerce has been the sole sponsor the festival since its advent, or whether the Tawas community, as a whole, organizes the event. Neil Thornton, a local historian, testified in his deposition that Mr. Gould originally pitched the idea of the festival to the Tawas Chamber of Commerce. *Id.* at 8. In the 1960s, the Chamber began formally sponsoring the festival. *Id.* at 9. Defendants represent that the festival has always been associated, formally or informally, with the Chamber. *See id.* at 8–10. Keith Franks, the current president of the Chamber, has averred that he has helped organize Perchville every year since 1975 and that the Chamber "has been the organizer and sponsor of the Perchville festival during the entire time I have been involved." Frank Aff. at 2, ECF No. 14, Ex. 1. The Trading Post points to the fact that the Chamber's records from the 1980s do not contain information about Perchville as proof that some other entity must have organized the festival during that time. *See* Agnello Aff. at ¶ 2, ECF No. 19, Ex. 3. The Trading Post does not affirmatively identify any

other entities which have formally organized the festival. Rather, the Trading Post argues that the festival is put on by and for the city of Tawas as a whole.

**A.**

In March 2002, the Chamber applied for a federal trademark registration for the term "Perchville." ECF No. 14, Ex. 3. That trademark was registered in May 2003. *Id.* In December 2013, that trademark was cancelled for failure to file a renewal application. Buresh Dep. at 34–35. Within three weeks, the Chamber reapplied for the same trademark, which was promptly registered. 2014 Application, ECF No. 14, Ex. 5; ECF No. 14, Ex. 6.

According to the Chamber, it has had an informal policy regarding use of the word "Perchville" since at least before 2008. Frank Aff. at 2. *See also* Bolen Dep. at 14, ECF No. 13, Ex. C. The policy was not formalized in writing until October 2015. Bolen Dep. at 14; Buresh Dep. at 30–31. The Chamber represents that the policy works as follows: Chamber members may use the mark, providing they ask permission and obtain approval of the specific use. Frank Aff. at 3. Non-Chamber members must pay a fee of $750 and also receive Chamber approval of the use. *Id.*; Buresh Dep. at 31.

According to the Trading Post, numerous local Tawas businesses have used the word "Perchville" on products and signs without receiving permission from the Chamber and without enforcement action by the Chamber. The Trading Post provides several examples of this non-enforcement: According to Laura Loeffler, a former chairwomen of the Perchville Committee for the Chamber, the Chamber was aware that several member and non-member businesses were using "Perchville" in "advertisements . . . , banners, windows displays; and for some businesses, the production and sale of T-shirts and sweatshirts." Loeffler Aff. at 2, ECF No. 13, Ex. D.[1] *See*

[1] Loeffler also disputes the existence of a verbal or written license at all. *Id.*

*also* Agnello Aff. at 2 (same); Cowley Aff. at 2, ECF No. 13, Ex. G (former manager of Tawas Holiday Inn explaining that the hotel had used the name "Perchville" in its advertising and on "T-shirts, sweatshirts and mug holders that were sold to the general public"); Mahalak Aff. at 2, ECF No. 13, Ex. H (co-owner of Advanced Car Audio -n'- Detailing stating that the company sold t-shirts bearing the name "Perchville" from 2011 to approximately March of 2015).

The Chamber asserts that the Trading Post's examples purporting to show that it has failed to enforce its trademark are misleading. Rather, the Chamber asserts that many uses of the mark which the Trading Post identifies involved formal "sponsors" of the festival. Every year, the Chamber solicits financial contributions from local businesses. *See* ECF No. 18, Ex. E3 and E4. In exchange for the donation, sponsors are given permission to place advertisements regarding for the festival on their premises. Mooney Aff. at 3, ECF No. 18, Ex. C. As Shelley Buresh stated:

> The Chamber encourages and requests certain businesses to promote the festival by putting advertisments on their marquees stating to the effect: "Welcome to Perchville." . . . These types of advertisements are on the marquees and posters in business windows, [and] are the types of use of the name Perchville that I have observed as a lifelong resident of the area.

Buresh Aff. at 4.

The Chamber further states that it has enforced the usage policy against several noncomplying businesses in the past. Anne Blackmore, a former Program Director of the Chamber, avers that in 2005 she "learned of six businesses that appeared to be using the mark without permission of the Chamber." Blackmore Aff. at 2, ECF No. 18, Ex. E. Ms. Blackmore contacted the businesses and informed them that they were violating the Chamber's trademark. *Id. See also* ECF No. 18, Ex. E2 (the letter sent by the Chamber enforcing its trademark against the infringing businesses and threatening to sue). As discussed below, the Chamber has also

enforced its trademark against the Trading Post and against the Twisted Twins Emporium, a local store which had bought several allegedly infringing shirts from the Trading Post. Buresh Dep. at 58–60.

**B.**

The Trading Post was formed in May 2015 by Arthur Cruse. Cruse Dep. at 15. Around the same time, the newly founded Trading Post acquired Advanced Car Audio & Detailing's t-shirt business. *Id.* at 24. The two owners of Advanced Car Audio, Ryan and Ray Mahalak, each became five percent owners of the Trading Post. *Id.* at 18. Soon after the Trading Post was created, Sal Agnello was hired to be the business's external sales representative. *Id.* at 29. Mr. Agnello was an employee who received a W-2 report for his compensation and worked from ten to thirty hours per week. *Id.* Mr. Agnello served as a member of the Chamber's Perchville Committee committee from approximately 2003 to 2013, Agnello Dep. at 24, ECF No. 13, Ex. F, but the Trading Post is not a member of the Chamber.

The Trading Post planned to design and sell approximately 300 Perchville-themed t-shirts for Perchville 2016.[2] Cruse Dep. at 100. A local store, the Twisted Twins Emporium, placed an order with Mr. Agnello for approximately 30 of the shirts. Agnello Dep. at 34. Although the record is unclear, it appears that those shirts were actually produced and sold to the Emporium by the Trading Post. *Id.* at 49–51. After the shirt was designed, Mr. Agnello posted a picture of the design on Facebook. Buresh Dep. at 58. The Chamber learned of the post, but did not take immediate action. Soon after, the Twisted Twins Emporium posted on Facebook that they were selling Perchville t-shirts. *Id.*

[2] In October 2015, Mr. Cruse met with representatives of the Chamber and discussed the trademark policy. Cruse Dep. at 86. Mr. Cruse was unwilling at that time to pay the $750 licensing fee. *Id.* at 88.

On January 29, 2016, the Chamber filed suit against Mr. Agnello in the Twenty-Third Circuit Court for the State of Michigan, Iosco County for purposes of obtaining an injunction against his unauthorized use of the word "Perchville" on the t-shirts. State Court Compl., ECF No. 14, Ex. 7. At this time, the Chamber was unaware that Mr. Agnello was selling the shirts on behalf of the Trading Post. Judge William F. Myles granted the Chamber an ex parte injunctive order and set a hearing for February 2, 2016. Ex Parte Order, ECF No. 14, Ex. 8. The text of the ex parte order provided that "this order shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys and on those persons in active concert or participation with them who receive actual notice of this order by personal service [or] otherwise." *Id.* at 2.

The same day the complaint was filed, the Chamber contacted the Twisted Sisters Emporium and informed them that the shirts being sold were not in compliance with the Chamber's trademark policy. Buresh Dep. at 58–61. The Emporium agreed to remove the shirts from the shelf. *Id.* at 59. According to Mr. Agnello, the Chamber also contacted several other businesses which Mr. Agnello had been attempting to sell to and informed them of the ex parte injunction. Agnello Dep. at 64–67. Mr. Agnello contends that the Chamber told these businesses that his shirts were substandard. *Id.* at 67.

Upon receiving notice of the injunction and hearing date, Mr. Agnello discussed the suit with Mr. Cruse, the owner of the Trading Post. Agnello Dep. at 56–58. According to Mr. Agnello, Mr. Cruse believed that the lawsuit should have been brought against him, not Mr. Agnello. *Id.* In his deposition, Mr. Cruse indicated that he recommended that Mr. Agnello seek legal counsel. Cruse Dep. at 31. Mr. Cruse admitted that Mr. Agnello showed him the ex parte

injunction. *Id.* at 32. Mr. Cruse also acknowledged that he was "talking to a lawyer at the time." *Id.* at 34.

At the hearing, Mr. Agnello told Judge Myles: "I don't understand, Your Honor, nor does my boss, Art 'Cruse', who owns the company for whom I work with. He feels it shouldn't even have been served on him, not me. I'm just -- I'm a salesman. . . . These should have gone to them." Hearing Tr. at 4, ECF No. 14, Ex. 9. Judge Myles then asked if Mr. Agnello was represented by an attorney. Mr. Agnello replied: "I got this Sunday, so I had no time to get – the one attorney that is on a permanent retainer with my boss, one of them, is in Harrisville right now. Otherwise I would have had somebody here to fight this." *Id.* Mr. Agnello then told Judge Myles: "I have no problem signing a statement that I'm not selling them. We haven't sold nothing." *Id.* at 5. The court then informed Mr. Agnello that the injunction would also bar his boss from selling shirts, if Mr. Cruse had received a copy. *Id.* The Chamber's counsel, James W. Shotwell, then asserted that he had talked on the phone to Mr. Cruse and Mr. Agnello the day before about the suit. *Id.* Mr. Agnello quickly stated that Ray Mahollock, not Art Cruse, had been the part-owner participating in the phone call. *Id.* The judge then reiterated the scope of the injunction: "[a]nybody that has Notice [sic] and is acting in concert. You know, you may want to have them read this. Maybe they want to consult counsel too." *Id.*

The judge then asked if Mr. Agnello had any objection to a permanent injunction being entered. *Id.* at 7. Mr. Agnello told the judge that neither he nor the Trading Post had any intention of making or selling the shirts at issue. *Id.* at 7–8. However, Mr. Agnello did express some reluctance about consenting to the permanent injunction because he didn't understand all the terms within it. *Id.* at 8–9. The Chamber's counsel then informed Mr. Agnello that the text of the permanent injunction was substantially identical to the text of the ex parte injunction. *Id.* at

10. Upon learning that, Mr. Agnello indicated that he had no objection to entry of the permanent injunction. *Id.* at 11. Despite that representation, Mr. Agnello then stated: "Again, I'm sort of lost at this time. I would ask that the lawsuit itself be thrown out. Again, there was no harm, no foul. And the fact of the matter is, why are you – why are they coming after me? It's not my company." *Id.* at 11. In response, the judge stated:

> Well[,] the injunction indicates that the Order shall be binding upon the parties to this action, which is you and the Chamber, their offices, agents, servants, employees, and attorneys, and on those persons in active concert or participation with them who received actual notice. So just so you understand, you and everybody in your chain is on the hook. So if there's – if there is a violation, you know, then we're talking about contempt of Court.

*Id.* at 12.

After the hearing, Mr. Agnello informed Mr. Cruse that a permanent injunction had been entered. Cruse Dep. at 40. Mr. Cruse then sought legal counsel "to direct [him] in the proper direction and reverse the decision." *Id.* at 41. Since the entry of the permanent injunction, both Mr. Agnello and the Trading Post have complied with the injunction. *Id.* at 42, 67.

**II.**

The parties have filed cross motions for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**III.**

In its motion for summary judgment, the Trading Post argues that the Chamber does not have a valid trademark in "Perchville." The Trading Post further argues that, even if the Chamber did have a valid trademark at some point, it is no longer enforceable because the Chamber has not protected its rights and has abandoned the trademark. In the Chamber's motion for summary judgment, the Chamber argues that the Trading Post's trademark claims are barred by res judicata. The Chamber alternatively argues that it has a valid, enforceable trademark in "Perchville." In its motion for summary judgment, Dovetail argues that the Trading Post's business defamation and tortious interference claims should be dismissed because the Trading Post's basis for those claims stems from the Chamber's lawful enforcement of its trademark. The state court injunction is a final order resolving the enforceability of the Chamber's trademark, meaning the Trading Post's claim challenging the trademark is barred by res judicata. Defendants' motions for summary judgment will be granted in part and the Trading Post's motion for summary judgment will be denied.

**A.**

Federal courts must apply the preclusion law of the state in which judgment was rendered. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). Under Michigan law, res judicata "bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 470 Mich. 105, 121 (2004). Michigan courts apply the doctrine of res judicata broadly, "holding that

it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Id.* (quoting *Dart v. Dart*, 460 Mich. 573, 586 (1999)).

A permanent injunction serves as a final order on the merits. *See Ludwig v. Twp. of Van Buren*, 682 F.3d 457, 460 (6th Cir. 2012); *Falls Stamping & Welding Co. v. Int'l Union, United Auto. Workers, Aerospace & Agr. Implement Workers of Am., Region II*, 744 F.2d 521, 526 (6th Cir. 1984). The Trading Post does not contest that the state court injunction operates as a final order on the merits.

Likewise, the Trading Post does not argue that the present challenge to the trademark could not have been made at the state court injunction hearing. As mentioned above, res judicata bars every claim arising from the same transaction that the parties could have raised, even if they did not make the argument. *Adair*, 470 Mich. 121. A claim arises from the same transaction for res judicata purposes if the claims in the second case belong to the same "'factual grouping'" as the claims in the first case. *Id.* at 125 (quoting 46 Am. Jur. 2d, Judgments 533, p. 801). The analysis centers on whether the facts are related in time, space, origin, or motivation. *Id.* The issue at the state court hearing centered on whether Mr. Agnello (and those acting in concert with him) were in violation of the Chamber's trademark in "Perchville." If, as the Trading Post now argues, that trademark is either void or unenforceable, then no injunction should have been entered. The arguments the Trading Post now make would have operated as a complete defense, if accepted by the state court, to the injunction sought by the Chamber. Thus, the arguments the Trading Post now raises could have been raised at the injunction hearing.

Accordingly, the only issue (and the issue which the parties focus their briefing on) is whether Mr. Agnello was in privity with the Trading Post at the time the injunction was entered.

"To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." *Adair*, 470 Mich. at 122. More specifically, there must be both a "'substantial identity of interests' and a 'working functional relationship' in which the interest of the nonparty are presented and protected by the party in the litigation." *Id.* (quoting Baraga Co. v. State Tax Comm., 466 Mich. 264, 269–270 (2002)). Thus, a "perfect identity of the parties is not required." *Id.*

It is well settled that an injunction against an employer also bars employees. *See Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 12–13 (2003) ("[A] privy includes a person so identified in interest with another that he represents the same legal right, such as a principal to an agent, a master to a servant, or an indemnitor to an indemnitee."); *Ludwig v. Twp. of Van Buren*, 682 F.3d 457, 462 (6th Cir. 2012) ("An enjoined corporation must effectively bind its future employees; otherwise those seeking an injunction cannot get full relief.").

The Trading Post argues, however, that the inverse is not true: an injunction entered against an employee does not bind the employer. In support of this assertion, the Trading Post quotes 50 Corpus Juris Secundum § 1147:

> Where an employer defends an action against an employee, or has an opportunity to assume the defense, and is under an obligation to do so, because the acts complained of were done under the employer's orders, the employer is bound by the judgment. The employer, however, is not bound by a judgment against the employee where the employer had no opportunity to defend himself or herself in the action. Also, where the employer is not a party to the action against the employee, either actually or through privity of relationship to the employee, a judgment against the employee is not res judicata as against the employer.

*Id.*

The Trading Post does not cite any Michigan case law or Michigan-specific authorities in support of this proposition. More importantly, § 1147 also provides that "the common interests

implicit in an employment relationship ordinarily would tend to bring employers and employees in privity for purposes of res judicata." *Id.*

As a general matter, the Trading Post is correct that the employer/employee relationship is not, in all situations, sufficient to create privity for res judicata purposes. But privity clearly existed here, especially considering that the Trading Post had both notice of the enforcement action and an opportunity to challenge the validity of the trademark. Mr. Agnello was selling the shirts on behalf of the Trading Post and in his capacity as an employee of the Trading Post. Both the Trading Post and Mr. Agnello wanted to sell t-shirts. The injunction thus enjoined Mr. Agnello from performing part of his job for the Trading Post. Further, the language of the injunction made clear that it applied to "the parties in this action, their officers, agents, servants, employees, and attorneys and on those persons in active concert or participation with them who receive actual notice of this order by personal service [or] otherwise." Perm. Inj. at 2, ECF No. 14, Ex. 10. The Trading Post cannot reasonably argue that it was not working in "active concert" with its own employee who was selling shirts made by the company. Likewise, Mr. Cruse acknowledged in his deposition that he knew about the suit and read the preliminary injunction prior to the hearing. Thus, going into the hearing, both Mr. Agnello and the Trading Post had actual notice that an adverse decision would prevent them from selling shirts bearing the word "Perchville." Accordingly, there was a "substantial identity of interests."[3] If two parties are both

[3] The Trading Post's argument that there is not an identity of interests because "Agnello does not care whether he sells Perchville merchandise or non-Perchville merchandise, as he will be paid regardless and without affecting his employment" is without merit. In *Bates v. Twp. of Van Buren*, the Sixth Circuit found that there was a substantial identity of interests between an exotic dancing club and a dancer. 459 F.3d 731, 736 (6th Cir. 2006). The court found that the dancer's interests were protected by the club in the previous litigation because, if the club had prevailed, she would have been free to dance. *Id.* Thus, there was identity of interests: the club and the dancers both wanted leave for the employee to perform. The present case is analogous (excepting, of course, the nature of the commercial activity involved): Mr. Agnello and the Trading Post both wanted to sell the t-shirts. The Trading Post certainly had a greater financial interest in selling the t-shirts, but Mr. Agnello's interest was not negligible. Lost business for the Trading Post had the potential to impact his job security or financial compensation. *Adair* requires substantially similar interests, not identical interests. More importantly, this argument by the Trading Post ignores

bound by the same injunction that was issued in response to the same conduct, their interests in opposing the injunction were substantially identical.

Similarly, because Mr. Agnello was an employee of the Trading Post and operating on behalf of the Trading Post, there was a "functional working relationship."[4] Importantly, *Adair* does not require, as the Trading Post attempts to argue, that there be an "express or implied legal relationship" between the parties. *See Bates*, 459, F.3d at 737. Thus, Mr. Agnello's authority, or lack thereof, to represent the Trading Post in legal actions is not relevant.

Although the Trading Post does not directly make this argument, it is also irrelevant whether the arguments now advanced against the trademark's validity were actually made at the injunction hearing or not. *See id.* ("[I]f Bates's complaint is that particular arguments were not raised in the prior litigation, then it may be rejected on the ground that res judicata 'bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.'") (quoting *Adair*, 470 Mich. at 122). Mr. Agnello chose not to challenge the imposition of the permanent injunction in state court. Further, the Trading Post has complied with the injunction since it was imposed, suggesting that it recognizes that the state court injunction applies to them. The present suit is, in effect, an attempt by the Trading Post to appeal the state court decision to impose the injunction. But federal district courts do not review state court decisions, with a few clearly defined exceptions. *See Anderson v. Charter Twp. of Ypsilanti*, 71 F. Supp. 2d 730, 734 (E.D. Mich. 1999) (explaining that the *Rooker-Feldman* "doctrine prevents a federal district court from ruling on issues which are 'inextricably intertwined' with claims decided in state court proceedings").

---

that "because an employer can only act through its employees, . . . prospective relief must bind employees to have any effect." *Ludwig v. Twp. of Van Buren*, 682 F.3d 457, 461 (6th Cir. 2012). The fine distinction between employers and employees which the Trading Post is attempting to establish has thus been rejected.

[4] It is unclear whether this element requires independent proof from the substantial identity of interest element. *See Bates*, 459 F.3d at 735.

In short, Mr. Agnello and the Trading Post were in privity for purposes of the permanent injunction. They had a close business and legal relationship. Mr. Agnello was being sued for conduct he performed as part of his job duties. An adverse decision would have negatively impacted both Mr. Agnello and the Trading Post for the same reason. The question which the Trading Post is now requesting this Court to resolve is materially identical to the question already raised and decided in the state court action: does the Chamber have an enforceable trademark in the word "Perchville?" The state court decided, in a final judgment, that the answer is yes. The Trading Post was represented in that hearing by an employee and had actual notice of the action. Despite that, Mr. Agnello and the Trading Post chose not to challenge the trademark, despite the opportunity to do so. The Trading Post is not entitled to a second attempt to invalidate the trademark. The Trading Post's trademark claim is barred by res judicata and will be dismissed with prejudice.

**B.**

The Trading Post's only remaining claims arise out of state law. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claims if they form part of the same controversy as the federal claim. *See* 28 U.S.C. § 1367(a). A federal court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). However, the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor of remanding any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). State courts are experts in state law and deference should be accorded to that extensive knowledge of state law. The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its supplemental jurisdiction. Plaintiffs' supplemental state law claims will therefore be remanded to state court.

**IV.**

Accordingly, it is **ORDERED** that the Trading Post's motion for summary judgment, ECF No. 13, is **DENIED.**

It is further **ORDERED** that Defendants' joint motions for summary judgment, ECF Nos, 14, 15, are **GRANTED in part.**

It is further **ORDERED** that Count I of the Complaint, ECF No. 1, is **DISMISSED with prejudice.**

It is further **ORDERED** that this case is **REMANDED** to the Twenty-Third Circuit Court of the State of Michigan, Iosco County.

Dated: February 22, 2017

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 22, 2017.

s/Kelly Winslow for
MICHAEL A. SIAN, Case Manager