UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

AU SABLE RIVER TRADING POST, LLC,

                 Plaintiff,                             Case No. 16-cv-11207

v.                                              Honorable Thomas L. Ludington

DOVETAIL SOLUTIONS, INC., and
TAWAS AREA CHAMBER OF COMMERCE,

                 Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT IN PART, DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, AND REMANDING TO STATE COURT**

On March 4, 2016, Plaintiff Au Sable River Trading Post, LLC, ("Trading Post") filed a

complaint naming the Tawas Area Chamber of Commerce ("Chamber") and Dovetail Solutions,

Inc., ("Dovetail") as Defendants. ECF No. 1. In the complaint, the Trading Post seeks a declaratory

judgment invalidating a trademark the Chamber claims to have in the name "Perchville," which is

associated with a yearly winter festival in Tawas, Michigan. The Trading Post also brings state

law claims for business defamation, tortious interference with a contract, and tortious interference

with a business relationship. On April 4, 2016, Defendants removed the case to federal court

because the Trading Post was advancing a federal claim under the Lanham Act, 15 U.S.C. § 1051

*et seq.*

During the first week of December 2016, Plaintiff and Defendants filed cross-motions for

summary judgment. ECF Nos. 13, 14, 15. In its motion for partial summary judgment, the Trading

Post sought a judgment invalidating the Chamber's trademark. In their motions for summary

judgment, Defendants argued that the trademark claim was barred by the doctrine of res judicata,

that the trademark was enforceable, and that the state law claims should be dismissed. On February

22, 2017, the Court issued an opinion and order granting in part the Defendants' motions for summary judgment, denying Plaintiff's motion for summary judgment, and remanding the state law claims. ECF No. 27. The Court concluded that the Trading Post's trademark claim was barred by the doctrine of res judicata because a state court had issued a permanent injunction on using the trademark against an employee of the Trading Post (and all individuals working in concert with that employee).

The Trading Post appealed. ECF No. 30. On October 23, 2017, the Sixth Circuit issued an opinion concluding that the Trading Post employee was not in privity with his employer for purposes of res judicata. ECF No. 32. Pursuant to that conclusion, the Sixth Circuit remanded for consideration of the trademark claim on the merits. On November 15, 2017, a status conference was held wherein all participants agreed that Sixth Circuit's opinion revived the previously filed summary judgment motions and that no additional briefing was necessary. For the following reasons, Defendants' motions for summary judgment will be granted in part, Plaintiff's motion for summary judgment will be denied, Plaintiff's federal trademark claim will be dismissed, and the state law claims will be remanded.

## I.

The facts have not changed since the Court issued its February 22, 2017, opinion and order. The Tawas Chamber of Commerce is a non-profit Michigan corporation dedicated to promoting local businesses. Dovetail Solutions, Inc., is a for-profit corporation which has a contract to "oversee the day-to-day operations and . . . management of the Chamber of Commerce." Buresh Dep. at 6, ECF No. 14, Ex. 4. The Au Sable River Trading Post is a wholesale provider of miscellaneous products, including mugs, banners, t-shirts, sweatshirts, key chains, swimsuits, skateboards, and similar items. Cruse Dep. at 19–21, ECF. No. 14, Ex. 12.

- 2 -

Since at least the 1960s, an annual winter festival known as "Perchville" has been held in Tawas, Michigan. Thornton Dep. at 8–9, ECF No. 13, Ex. A. Originally, the idea to hold the festival was conceived of by a local businessman, Harold Gould. *Id.* at 8. The parties dispute whether the Tawas Chamber of Commerce has been the sole sponsor the festival since its advent, or whether the Tawas community, as a whole, organizes the event. Neil Thornton, a local historian, testified in his deposition that Mr. Gould originally pitched the idea of the festival to the Tawas Chamber of Commerce. *Id.* at 8. In the 1960s, the Chamber began formally sponsoring the festival. *Id.* at 9. Defendants represent that the festival has always been associated, formally or informally, with the Chamber. *See id.* at 8–10. Keith Franks, the current president of the Chamber, has averred that he has helped organize Perchville every year since 1975 and that the Chamber "has been the organizer and sponsor of the Perchville festival during the entire time I have been involved." Frank Aff. at 2, ECF No. 14, Ex. 1. The Trading Post asserts that the Chamber's records from the 1980s do not contain information about Perchville, and consequently argue that some other entity must have organized the festival during that time. *See* Agnello Aff. at ¶ 2, ECF No. 19, Ex. 3. The Trading Post does not affirmatively identify any other entities which have formally organized the festival. Rather, the Trading Post argues that the festival is put on by and for the city of Tawas as a whole.

## A.

In March 2002, the Chamber applied for a federal trademark registration for the term "Perchville." ECF No. 14, Ex. 3. That trademark was registered in May 2003. *Id.* In December 2013, that trademark was cancelled for failure to file a renewal application. Buresh Dep. at 34–35. Within three weeks, the Chamber reapplied for the same trademark, which was registered approximately one year later. 2014 Application, ECF No. 14, Ex. 5; ECF No. 14, Ex. 6.

- 3 -

According to the Chamber, it has had an informal policy regarding use of the word "Perchville" since at least 2008. Frank Aff. at 2. *See also* Bolen Dep. at 14, ECF No. 13, Ex. C. The policy was not formalized in writing until October 2015. Bolen Dep. at 14; Buresh Dep. at 30–31. The Chamber represents that the policy works as follows: Chamber members may use the mark, providing they ask permission and obtain approval of the specific use. Frank Aff. at 3. Non-Chamber members must pay a fee of $750 and also receive Chamber approval of the use. *Id.*; Buresh Dep. at 31.

According to the Trading Post, numerous local Tawas businesses have used the word "Perchville" on products and signs without receiving permission from the Chamber and without enforcement action by the Chamber. The Trading Post provides several examples of this non-enforcement: According to Laura Loeffler, chairwomen of the Perchville Committee for the Chamber from 2007 to 2012, the Chamber was aware that several member and non-member businesses were using "Perchville" in "advertisements . . . , banners, windows displays; and for some businesses, the production and sale of T-shirts and sweatshirts." Loeffler Aff. at 2, ECF No. 13, Ex. D.[1] *See also* Agnello Aff. at 2 (same); Cowley Aff. at 2, ECF No. 13, Ex. G (former manager of Tawas Holiday Inn explaining that the hotel had used the name "Perchville" in its advertising and on "T-shirts, sweatshirts and mug holders that were sold to the general public"); *id.* (East Tawas Business Association sold chili mugs containing the mark during the chili cook-off competition); Mahalak Aff. at 2, ECF No. 13, Ex. H (co-owner of Advanced Car Audio -n'- Detailing ["ACAD"] stating that the company sold t-shirts bearing the name "Perchville" from 2011 to approximately March of 2015).

---

[1] Loeffler also disputes the existence of a verbal or written license at all. *Id.*

The Chamber rejects the idea that it has failed to enforce its trademark. Rather, the Chamber asserts that many uses of the mark which the Trading Post identifies involved formal "sponsors" of the festival. Every year, the Chamber solicits financial contributions from local businesses. *See* ECF No. 18, Ex. E3 and E4. In exchange the donation, sponsors are given permission to place advertisements regarding for the festival on their premises. Mooney Aff. at 3, ECF No. 18, Ex. C. As Shelley Buresh stated:

> The Chamber encourages and requests certain businesses to promote the festival by putting advertisements on their marquees stating to the effect: "Welcome to Perchville." . . . These types of advertisements are on the marquees and posters in business windows, [and] are the types of use of the name Perchville that I have observed as a lifelong resident of the area.

Buresh Aff. at 4.

The Chamber further states that it has enforced the usage policy against several noncomplying businesses in the past. Anne Blackmore, a former Program Director of the Chamber, avers that in 2005 she "learned of six businesses that appeared to be using the mark without permission of the Chamber." Blackmore Aff. at 2, ECF No. 18, Ex. E. Ms. Blackmore contacted the businesses and informed them that they were violating the Chamber's trademark. *Id.* *See also* ECF No. 18, Ex. E2 (reproducing the letters sent by the Chamber enforcing its trademark against the infringing businesses and threatening to sue). As discussed below, the Chamber has also enforced its trademark against the Trading Post and against the Twisted Twins Emporium, a local store which bought several allegedly infringing shirts from the Trading Post. Buresh Dep. at 58–60.

## B.

The Trading Post was formed in May 2015 by Arthur Cruse. Cruse Dep. at 15. Around the same time, the newly founded Trading Post acquired Advanced Car Audio & Detailing's t-shirt

business. *Id.* at 24. The two owners of Advanced Car Audio, Ryan and Ray Mahalak, each became five percent owners of the Trading Post. *Id.* at 18. Soon after the Trading Post was created, Sal Agnello was hired to be the business's external sales representative. *Id.* at 29. Mr. Agnello was a W-2 employee who worked from ten to thirty hours per week. *Id.* Mr. Agnello was also a member of the Chamber's Perchville Committee from approximately 2003 to 2013, Agnello Dep. at 24, ECF No. 13, Ex. F. The Trading Post is not a member of the Chamber.

The Trading Post planned to design and sell approximately 300 Perchville-themed t-shirts for Perchville 2016.[2] Cruse Dep. at 100. A local store, the Twisted Twins Emporium contacted Mr. Agnello and placed an order with the Trading Post for approximately 30 of the shirts. Agnello Dep. at 34. It appears that those shirts were produced and sold to the Emporium by the Trading Post. *Id.* at 49–51. After the shirt was designed, Mr. Agnello posted a picture of the design on Facebook. Buresh Dep. at 58. The Chamber learned of the post, but did not take immediate action. Soon after, the Twisted Twins Emporium posted on Facebook that they were selling Perchville t-shirts. *Id.*

On January 29, 2016, the Chamber filed suit against Mr. Agnello in state court for purposes of obtaining an injunction against his unauthorized use of the word "Perchville" on the t-shirts. State Court Compl., ECF No. 14, Ex. 7. The state court granted the Chamber an ex parte injunctive order and set a hearing for February 2, 2016. Ex Parte Order, ECF No. 14, Ex. 8. The text of the ex parte order stated that "this order shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys and on those persons in active concert or participation with them who receive actual notice of this order by personal service [or] otherwise." *Id.* at 2.

---

[2] In October 2015, Mr. Cruse met with representatives of the Chamber and discussed the trademark policy. Cruse Dep. at 86. At the time, Mr. Cruse refused to pay the $750 licensing fee. *Id.* at 88.

The same day the complaint was filed, the Chamber contacted the Twisted Sisters Emporium and informed them that the shirts they had purchased from Mr. Agnello and the Trading Post were not in compliance with the Chamber's trademark policy. Buresh Dep. at 58–61. The Emporium agreed to remove the shirts from the store. *Id.* at 59. According to Mr. Agnello, the Chamber also contacted several other businesses which Mr. Agnello had been attempting to sell to and informed them of the ex parte injunction. Agnello Dep. at 64–67. Mr. Agnello contends that the Chamber told these businesses that his shirts were substandard. *Id.* at 67.

On February 2, 2016, the state court issued a permanent injunction prohibiting Mr. Agnello from selling merchandise which bore the name "Perchville." Perm. Inj., ECF No. 14, Ex. 10. At the motion hearing, Mr. Agnello indicated his belief that the suit should have been brought against his employer, not him. Hearing Tr. at 4, ECF No. 14, Ex. 9. Nevertheless, Mr. Agnello consented to entry of the injunction and promised to comply with it. *Id.* at 10–12.

After the hearing, Mr. Agnello informed Mr. Cruse that a permanent injunction had been entered. Cruse Dep. at 40. Mr. Cruse then sought legal counsel "to direct [him] in the proper direction and reverse the decision." *Id.* at 41. Since the entry of the permanent injunction, both Mr. Agnello and the Trading Post have complied with the injunction. *Id.* at 42, 67.

## II.

The parties have filed cross motions for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific

facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III.

The Trading Post brings only one federal claim: a request for a declaratory judgment invalidating the Chamber's federal trademark in the name "Perchville." That claim arises out of the Lanham Act, 15 U.S.C. § 1051 *et seq.* Because both the Trading Post and the Defendants seek summary judgment on this claim, it will be considered first. Even drawing all reasonable inferences in favor of the Trading Post, there is no genuine issue of fact regarding the trademark's enforceability. Accordingly, Defendants are entitled to judgment on the first count. Because all remaining counts arise out of state law, they will be remanded.

## A.

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (internal citations omitted). Trademarks help "consumers identify goods and services that they wish to purchase, as well as those they want to avoid." *Id.* Trademark protection has ancient origins in the "common law and in equity." *Id.* In 1870, "Congress stepped in to provide a degree of national uniformity" to trademark protection, and federal protection of trademarks continues to this day. *Id.* at 1751–52. "The foundation of current federal trademark law is the Lanham Act, enacted in 1946." *Id.* at 1752.

Under the Lanham Act, "trademarks that are 'used in commerce' may be . . . federally registered." *Id.* (citing 15 U.S.C. § 1051(a)(1). Federal registration "'confers important legal rights and benefits on trademark owners who register their marks.'" *Id.* at 1753 (quoting *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1317 (2015) (Thomas, J., dissenting). Specifically,

> Registration on the principal register (1) "serves as 'constructive notice of the registrant's claim of ownership' of the mark," *ibid.* (quoting 15 U.S.C. § 1072); (2) "is 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate,' " *B & B Hardware*, 575 U.S. at ——–, 135 S.Ct., at 1300 (quoting § 1057(b)); and (3) can make a mark " 'incontestable' " once a mark has been registered for five years," *ibid.* (quoting §§ 1065, 1115(b)); see *Park 'N Fly*, 469 U.S., at 193, 105 S.Ct. 658. Registration also enables the trademark holder "to stop the importation into the United States of articles bearing an infringing mark." 3 McCarthy § 19:9, at 19–38; see 15 U.S.C. § 1124.

*Id.*

However, there are limits on the kinds of marks that can be registered. "'The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness." *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.*, 76 F.3d 743, 748 (6th Cir. 1996) (quoting *Blinded Veterans Ass'n. v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C.Cir.1989)). "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). "Within the two basic categories are sub-categories that form the complete spectrum of distinctiveness of marks." Spectrum of distinctiveness of marks—Placement of candidates on the spectrum, 2 *McCarthy on Trademarks and Unfair Competition* § 11:2 (5th ed.).

The Sixth Circuit has identified four subcategories of marks: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.'" *Bath & Body Works, Inc.,* 76 F.3d at 748 (quoting *Blinded Veterans Ass'n.*, 872 F.2d at 1039). "'A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances.'" *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984) (quoting *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977)). "A merely descriptive term specifically describes a characteristic or ingredient of an article. It can, by acquiring a secondary meaning, i.e., becoming 'distinctive of the applicant's goods' ..., become a valid trademark." *Id.* (quoting *Miller Brewing*, 561 F.2d at 79).

Suggestive, arbitrary, and fanciful marks, "because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 768 (1992). A "suggestive" term "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (internal citations omitted). "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached" *Id.* (internal citations omitted). "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned," such as EXXON or KODAK." *Id.* (internal citations omitted). The fact that a mark has been registered "creates a presumption that the mark is not [merely] descriptive." *Id.* at 1118.

The Chamber argues, first, that "Perchville" is a fanciful term and thus inherently distinctive. Alternatively, the Chamber contends that "Perchville" has acquired distinctiveness via secondary meaning. The Trading Post argues that "Perchville" is generic and thus not protectable.

**1.**

In its response to the Trading Post's motion for partial summary judgment, the Chamber argues that "Perchville is . . . a fanciful mark. It has no meaning independent of the festival. It does not describe anything. There is no such thing as a village of perches. The only purpose of the term Perchville is to operate as a trademark, i.e., to identify a particular festival." Def. Chamber Resp. Br. at 11, ECF No. 18. The Trading Post has declined to file a reply brief in support of its motion for partial summary judgment. The Trading Post has likewise declined to expressly address the Chamber's argument that "Perchville" is inherently distinctive in any of its other briefing. The Chamber's argument stands unrebutted for good reason: The term "Perchville" is inherently distinctive.

The term "Perchville" carries no "significance recognized in everyday life." *Champions Golf Club*, 78 F.3d at 1117 (internal citations omitted). A person who heard the term but had no knowledge of the yearly festival in Tawas would find the term largely indecipherable. Accordingly "Perchville" signifies "nothing other than the product or service to which the mark has been assigned," namely, the yearly winter festival in Tawas. *Champions Golf Club*, 78 F.3d at 1117 (internal citations omitted). In other words, "Perchville" appears to be a fanciful mark.

As the Chamber implicitly recognizes, however, the mark does include terms which have some meaning in everyday life. Lake Huron contains perch, and many villages border Lake Huron. A shrewd individual might intuit that the term refers to something like a gathering of fishermen, and, indeed, Perchville appears to include an ice fishing contest. Even under this extremely

charitable interpretation of "Perchville," however, a listener must "use imagination and perception to determine the nature of the" event being referred to. *Champions Golf Club*, 78 F.3d at 1117 (internal citations omitted). When a mark is registered, a presumption arises that the mark is inherently descriptive. *See id.* at 1118. The Trading Post has identified no evidence or authority to rebut that presumption. Because the term "Perchville" is, at the very least, "suggestive, no proof of secondary meaning is required. *Id.* at 1117.

**2.**

Even assuming that "Perchville" is merely descriptive, the Trading Post has not carried its burden of demonstrating that it is generic. "If a trademark has been registered, there is a presumption that term is not generic and the defendant must overcome the presumption." *Bath & Body Works, Inc.*, 76 F.3d at 748. If the Trading Post overcomes that presumption, then the mark is not protectable. If the Trading Post does not overcome the presumption, then the question becomes whether "Perchville" has acquired secondary meaning. *See Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1040–41 (D.C. Cir. 1989).

"If a mark's primary significance is to describe a type of product rather than the producer, it is generic and is not a valid trademark." *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 404 (6th Cir. 2002). "Thus, the appropriate 'test for genericness is whether the [relevant] public perceives the term primarily as the designation of the article.'" *Id.* (quoting *Blinded Veterans Association*, 872 F.2d at 1041. "Examples of unprotectible generic names are 'aspirin,' 'escalator,' and 'light beer.'" *Champions Golf Club, Inc.*, 78 F.3d at 1117 (internal citations omitted).

The Trading Post argues that "Perchville" is a generic term "because it is merely a generic, common descriptive term for the annual event in the Tawas area." Pl. Mot. Summ. J. at 15. But

this argument admits, even assumes, that "Perchville" refers to a single, identifiable event. The term "Perchville" does not describe a category or type of winter festivals. All parties agree that the term refers only to one thing: the annual festival held in Tawas. The Trading Post's argument that "Perchville" is generic is akin to arguing that the term "Super Bowl" is generic because "it is merely a generic, common descriptive term for the annual [professional football championship in the United States]."

The Trading Post's argument that "Perchville" is generic and thus not protectable appears to be premised on the idea that an average person would not associate the Perchville festival with the Tawas Chamber of Commerce. *See id.* at 15, 17–18. In support of this argument, the Trading Post relies on the following principle:

> To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, "That is the article I want because I know its source," and not the negative inquiry as to "Who makes that article?" In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

*Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991).

To begin with, the "single source" requirement is specific to the secondary meaning analysis. If, as explained above, "Perchville" is inherently distinctive, then the fact that the owner of the mark may be anonymous is not relevant. *See* 2 *McCarthy on Trademarks and Unfair Competition* § 12:7 (5th ed.) (collecting sources). And, more importantly, "[a]ll courts agree that secondary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source." 2 *McCarthy on Trademarks and Unfair Competition* § 15:8 (5th ed.) (citing *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 315 n.7 (6th Cir. 2001) ("While the law allows secondary meaning to be established by demonstrating that the

public is aware that the product comes from an *anonymous* source, there must be evidence indicating that it is a *single, anonymous* source.") (emphasis in original))

There is a genuine question of fact regarding whether the public is aware that the Chamber is the source and holder of the "Perchville" mark. But even assuming that the Chamber is an anonymous source, there is no issue of fact that the Chamber is the sole source of the mark. Defendants have provided unrebutted evidence that Harold Gould first pitched the idea of a yearly winter festival to the Chamber in the 1960s. Thornton Dep. at 8–9. Members of the Chamber have attested that the Chamber has been involved in organizing the festival every year since, and the Trading Post has not identified contradictory evidence. Frank Aff. at 2. The Trading Post's argument that is premised on two ideas. First, the Trading Post contends that the Chamber is not the *sole* organizer of the festival. Rather, Plaintiff believes that Perchville is "co-sponsored by volunteers donating money, in kind services, and work in conducting the event." *See* Agnello Aff. at 2. Second, the Trading Post argues that a review of the Chamber's records "reveals various years in the past where no mention is made of Perchville at all, indicating that the sponsorship and work at such times were that of volunteers or other non-chamber entities." *Id.*

These nonspecific speculations fall far short of rebutting the presumption that the mark is nongeneric. At best, the Trading Post's argument suggests that the public may be confused regarding who is the true sponsor and organizer of the festival. But, even if true, that uncertainty is irrelevant. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 30 n.7 (1st Cir. 1989) ("In this case, the district court found, and we agree, that the public will infer sponsorship by some organization when it sees a Boston Marathon shirt. Thus, the public's lack of knowledge as to the

- 14 -

exact identity of that source is irrelevant on this issue.").[3] The fact that volunteers assist in organizing the festival does not undercut the Chamber's assertion that it is the sole sponsor of the festival. Volunteerism is a vital part of any festival, but no reasonable person would believe that volunteers for a festival thereby obtain trademark rights in the festival's name. Likewise, the absence of records regarding which entity organized Perchville for certain years falls short of demonstrating that someone besides the Chamber is the "source" of the festival. To the contrary, the Trading Post's argument about records implicitly recognizes that most the relevant records demonstrate that the Chamber is responsible for the festival.[4] It must be remembered that "registration of a mark" is "prima facie evidence . . . of the owner's ownership of the mark." 15 U.S.C. § 1057. *See also B & B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. 1293 (2015). In the absence of any evidence indicating that some entity other than the Chamber may be the true sponsor of the festival and thus the true owner of the mark, the fact that the public may not actually be aware that the Chamber sponsors "Perchville" is irrelevant. *See Boston Ass'n*, 867 F.2d at 30 n.7; 2 *McCarthy on Trademarks and Unfair Competition* § 15:8 (5th ed.).

Properly understood, the Trading Post's objections to enforcement are not focused on the inherent genericness of the mark. As Defendants point out, the Trading Post repeatedly admits that "Perchville" refers to a single thing: the yearly festival in Tawas. Because the public would assume that the festival had a sponsor (even if the sponsor's identity was unknown), the mark is

---

[3] The Trading Post cites *Comite Fiestas De La Calle San Sebastian, Inc. v. Cruz* in support of its argument that the Chamber cannot enforce the trademark because the public does not associate "Perchville" with the Chamber 207 F. Supp. 3d 129, 142 (D.P.R. 2016). In that opinion, the court does suggest that a company could not enforce its trademark in the name of a yearly festival because "no evidence shows that consumers associate the mark with the source of the [festival] only with the goods, dates, and location of the [festival]." [sic] (emphasis in original). *Id.* This opinion is unpersuasive because it appears to disregard the single but anonymous source rule. *Comite* is also factually distinguishable because it appears that the mark in question had not been registered, and thus there was no presumption of enforceability.

[4] In fact, in its complaint, the Trading Post alleges that the Chamber has "[h]istorically and to present date . . . sponsored certain events associated with the festivities." Compl. at 2.

nongeneric. *See Boston Ass'n*, 867 F.2d at 30 n.7. Notwithstanding that fact, the Trading Post believes the mark is not enforceable because "[e]ver since the annual winter festival began in the 1960s, numerous and various persons and entities have used the name 'Perchville' in their marketing and retail products without the permission of the Chamber and without sharing any proceeds derived therefrom with the Chamber." Pl. Mot. Summ. J. at 15, 17. In essence, the Trading Post is arguing that the Chamber has abandoned an otherwise enforceable mark, not that the mark could never be validly registered.

**B.**

Pursuant to 15 U.S.C. § 1127, "[a] mark shall be deemed to be 'abandoned' if either of the following occurs:"

> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> (2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

*Id.*

Abandonment must be proved by clear and convincing evidence. *Nolan LLC v. TDC Int'l Corp.*, No. 06-14907, 2008 WL 11355576, at *2 (E.D. Mich. Mar. 31, 2008) (citing 3 *McCarthy on Trademarks and Unfair Competition* § 17:11 (5th ed.)) "And '[b]ecause a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" *Stilson & Assocs.,*

*Inc. v. Stilson Consulting Grp., LLC*, 129 F. App'x 993, 995 (6th Cir. 2005) (quoting *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002)).

The question of whether a mark is distinctive and thus protectable is related to but distinct from the question of whether a protectable mark has been abandoned. *Herman Miller, Inc.*, 270 F.3d at 310. In other words, "the fact that trade dress may be *protectable* by acquiring secondary meaning does not mean it is automatically *protected* since the owner's trade dress rights might have been abandoned through actions of the owner that caused the trade dress to become generic or lose its significance as a mark." *Id.* (emphasis in original). Importantly, however, alleged abandonment of a mark is relevant only insofar as the failure to police infringing uses causes the mark to lose its distinctiveness. As explained by the Sixth Circuit:

> "[I]f, through failure to prosecute, a mark continually loses 'strength' and 'distinctiveness,' it will eventually hemorrhage so much that it dies as a mark. That would be 'abandonment' through acts of omission." However, the observer goes on to state that, "[t]he issue is hardly ever 'abandonment,' because that requires proof that the mark has lost all significance as an indication of origin." Although it appears unlikely that failure to prosecute, by itself, can establish that trade dress has been abandoned, it is possible that, in extreme circumstances, failure to prosecute may cause trade dress rights to be extinguished by causing a mark to lose its significance as an indication of source.

*Id.* at 317 (quoting 2 *McCarthy on Trademarks and Unfair Competition* § 17:17 (5th ed.) (internal citations omitted)).

There is minimal evidence that any failure by the Chamber to prosecute infringing uses of the mark has diluted its significance to the point of genericness. To the contrary, most of the identified uses which the Trading Post identifies involve banners and other advertisements of the festival itself. *See, e.g.*, Loeffler Aff. at 2. Thus, rather than diluting the significance of the term as standing for a single, yearly event, the identified uses have actually strengthened the significance of the mark.

**1.**

Most of the arguments made by the parties focus on the second kind of abandonment, whereby the owner's course of conduct causes the mark to become generic. The Trading Post does identify five businesses which have sold goods bearing the mark in the past. *See* Cowley Aff. at 2 (former manager of Tawas Holiday Inn explaining that the hotel had used the name "Perchville" in its advertising and on "T-shirts, sweatshirts and mug holders that were sold to the general public"); *id.* (East Tawas Business Association sold chili mugs containing the mark during the chili cook-off competition); Mahalak Aff. at 2 (co-owner of Advanced Car Audio –n'- detailing stating that the company sold t-shirts bearing the name "Perchville" from 2011 to approximately March of 2015); Buresh Dep. at 58–60 (explaining that the Trading Post sold shirts bearing the mark to the Twisted Sisters Emporium). The latter two examples, involving the Trading Post and Twisted Sisters Emporium, arise out of the dispute which gave birth to the current suit and, of course, involved a prosecution against infringement. Thus, the Trading Post has only identified three prior infringing commercial uses which the Chamber did not take action against. And the Trading Post has only provided one example of an infringing company—the East Tawas Business Association's which sold mugs during the Perchville chili cook-off—where the Chamber was aware of the use. Cowley Aff. at 2 (alleging that the Chamber was aware of uses of the mark to promote the festival and/or sell merchandise, but not expressly identifying any business which used the mark commercially other than the East Tawas Business Association).

There is a genuine issue of fact regarding whether businesses in Tawas used the mark to sell merchandise *with* the Chamber's knowledge and without action by the Chamber. But even viewing all evidence in a light most favorable to the Trading Post, there is no evidence that lack of enforcement has resulted in the mark becoming generic. Importantly, "[a] trademark owner is

not required to act against every infringing use no matter how inconsequential at risk of losing rights in the mark." 3 *McCarthy on Trademarks and Unfair Competition* § 17:17 (5th ed.). Instead, "[i]t is reasonable for the trademark owner to object only to those third-party uses which it believes would conflict with its mark while not objecting to other third-party uses." *Id. See also Herman Miller, Inc*., 270 F.3d at 317 (citing *Sweetheart Plastics, Inc. v. Detroit Forming, Inc*., 743 F.2d 1039, 1048 (4th Cir.1984) ("Evidence of a trademark owner's failure to prosecute infringers is relevant to a determination of the defense of abandonment only where such failure amounts to the mark's losing significance as an indication of source.")); *Engineered Mech. Servs., Inc. v. Applied Mech. Tech., Inc.*, 584 F. Supp. 1149, 1160 (M.D. La. 1984); *Playboy Enterprises, Inc. v. Chuckleberry Pub.*, Inc., 486 F. Supp. 414, 422–23 (S.D.N.Y. 1980) ("The owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance.").

The Trading Post has not proferred any evidence which suggests that infringing uses by several businesses over the past twenty years have contributed to a material deterioration in the significance of "Perchville." To the contrary, these commercial uses seem designed to both trade upon and improve the goodwill associated with the "Perchville" festival. Accordingly, these uses appear to have actually strengthened the distinctiveness of the mark.[5] And, importantly, the

---

[5] To the extent the Trading Post is arguing, by implication, that these infringing uses create a question as to whether the Chamber owns the mark at all, these limited infringements fall far short of overcoming the presumption (created by registration) that the Chamber owns the mark. To the contrary, "the public will infer sponsorship by some organization when it sees a ["Perchville"] shirt." *See Boston Ass'n*, 867 F.2d at 30 n.7. There is no evidence in the record that any of the infringing businesses believed or caused the public to believe that they themselves were the sponsor of the festival. *See* Thornton Dep. at 20–21 ("And was it your intention to suggest it was the Book Nook that was sponsoring the Perchville festival? No; no. . . . And did you ever create banners that suggested that the Tawas Chamber of Commerce did not sponsor the Perchville Festival? No I never – I wouldn't have any idea. Why would I say that?"). The infringing uses were "clearly designed to take advantage of the [Perchville Festival] and to benefit from the good will associated with its promotion by [the Chamber]. [The infringers] thus obtain a 'free ride' at plaintiffs' expense." *Id* at 33.

Chamber has also identified unrebutted evidence that it has prosecuted infringers in the past. The present suit obviously arises out of prosecution of two infringers (the Trading Post and the Twisted Sisters Emporium). And, according to Anne Blackmore, the Chamber sent cease and desist letters to six businesses in 2005. Blackmore Aff. at 2.[6] *See also* Frank Aff., ECF No. 14, Ex. 1 (discussing previous enforcement efforts by the Chamber and attaching letters sent to infringers). Because lack of enforcement has not rendered the mark generic, abandonment has not occurred.

## 2.

The Trading Post nevertheless argues that abandonment has occurred because the Chamber has declined to prosecute infringing rights for a period of more than three consecutive years and because the Chamber has engaged in "naked licensing" of the mark. To succeed on its first argument (that the Chamber has affirmatively abandoned the mark), the Trading Post must identify evidence demonstrating a material issue of fact regarding whether the Chamber has "actually abandoned its mark through non-use and that it intended to do so." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 575 (6th Cir. 2000).

## i.

The Trading Post's first argument conflates several legal issues. Abandonment pursuant to a period of nonuse, by necessity, requires an analysis of whether the mark owner has affirmatively ceased using the mark with the intent to abandon. The fact that other commercial entities may have used the same mark during a three year-period is relevant only (as explained above) to the extent that it has eliminated the distinctiveness of the mark. Because that has not occurred, the Trading

---

[6] In a new affidavit attached to Plaintiff's response brief, Sal Agnello alleges that at least one business which received this letter in 2005 continued to sell merchandise containing the mark without adverse action by the Chamber. Sec. Agnello Aff at 2, ECF No. 19, Ex. 2. Even assuming to be true, the Trading Post has not explained how this infringing use diluted the significance of the mark.

Post can prevail on its abandonment argument only if it demonstrates that the Chamber has ceased using the mark with the actual intent to abandon it. That argument fails, however, because there is unrebutted evidence in the record that the Chamber has used the mark in commerce every year during the relevant time period.

The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The definition further provides that a mark is deemed to be used in commerce if "it is placed in any manner on the goods . . .  and . . . the goods are sold or transported in commerce." *Id.* There is uncontested evidence in the record that every year the Chamber orders and sells buttons bearing the mark to serve as "tickets" for admittance to the festival. *See* Buresh Dep. at 29–30. There is likewise uncontested evidence that the Chamber annually uses the mark in advertisements and sells sponsorship packages containing the mark. Blackmore Aff. at 2–3, ECF No. 18, Ex. E (explaining that the Chamber "sold thousands of buttons each year with the Perchville logo," that the Chamber "advertised the Perchville festival," and sold sponsorship packages to local businesses). Selling buttons and rights of sponsorship are sufficient to establish "use in commerce." Likewise, advertisements using the mark constitute use of the mark. *See Burgess v. Gilman*, No. 3:03 CV 0707 ECR RAM, 2006 WL 449212, at *5 (D. Nev. Feb. 23, 2006) ("CPS's use of the mark in advertising the brothel which it fully expected to be opening shortly does constitute use of the mark under the statute."). In other words, the Trading Post has identified no evidence in the record that the Chamber has ceased using the mark during the relevant timeframe, much less that the Chamber intended to abandon any rights in the mark. *See NetJets Inc. v. IntelliJet Grp., LLC*, 602 F. App'x 242, 245 (6th Cir. 2015) (explaining that abandonment occurs only if the mark is no

longer being used in the way typical in that industry *and* that the use was discontinued with intent not to resume.).

## ii.

The Trading Post's second argument—alleging naked licensing—is essentially a repackaging of its earlier argument that the Chamber's nonenforcement of its rights has rendered the mark generic. As the Sixth Circuit has explained,

> One method by which a mark may be abandoned is through "naked licensing," which occurs "[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee," such that "the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that are under the control of the owner of the mark" and the mark can no longer provide "a meaningful assurance of quality."

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764 (6th Cir. 2005) (quoting Restatement (Third) of Unfair Competition § 33 cmt. B (1995).

As with attempts to prove abandonment by other means, "the burden of proof faced by third parties attempting to show abandonment through naked licensing is stringent." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075–76 (5th Cir. 1997). Naked licensing results in loss of rights in a mark only if "a trademark has . . . ceased to function as an indicator of origin." *Id.* at 1079. Even if licensing "without any quality control provisions" has occurred, no presumption of loss of significance arises. *Id.* at 1080. Similarly, "a trademark owner's failure to pursue potential infringers does not in and of itself establish that the mark has lost its significance as an indicator of origin." *Id.*

There is simply no factual predicate in the record for a finding that the Chamber has abandoned the mark through naked licensing. The Chamber alleges that it has had an informal licensing policy regarding the mark since at least 2008. Frank Aff. at 2. *See also* Bolen Dep. at 14.

The Chamber further contends that that policy was formalized in writing in October 2015. Bolen Dep. at 14; Buresh Dep. at 30–31. The policy is as follows: Chamber members may use the mark, providing they ask permission and obtain approval of the specific use. Frank Aff. at 3. Non-Chamber members must pay a fee of $750 and also receive Chamber approval of the use. *Id.*; Buresh Dep. at 31.  The Trading Post identifies no evidence which contradicts or calls into question these assertions. At best, the Trading Post contends that the Chamber has turned a blind eye to the unlicensed use of the mark in the past. As the *Exxon* Court explains, that is relevant only to the extent the nonenforcement has caused the mark to lose its distinctiveness. For the reasons discussed above, that has not occurred.

The Chamber has identified unrebutted evidence that it has a licensing policy which requires applicants to disclose their intended use of the mark and receive approval by the Chamber. That uncontested evidence demonstrates that the Chamber exercises a certain amount of quality control over uses of the mark. To the extent the Chamber may not have always prosecuted local businesses which did not seek the license, that lack of enforcement has not caused the mark to become generic. Thus, the Chamber has not abandoned its rights in "Perchville."

## C.

Finally, the Trading Post argues that any attempts by the Chamber to enforce its trademark are barred by the doctrine of laches. "[L]aches precludes a plaintiff from recovering damages, [but] it does not bar injunctive relief." *Kellogg*, 209 F.3d at 568. Because the Trading Post has filed a request for declaratory judgment and is thus seeking injunctive relief (and to prevent the Chamber from seeking injunctive relief against it), the doctrine of laches is inapplicable here. Perhaps the Trading Post meant to assert a claim of acquiescence, which "requires 'a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff

- 23 -

would not assert his trademark rights against the defendant.'" *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991) (quoting *Sweetheart Plastics, Inc.*, 743 F.2d at 1046). "[B]oth laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, [but] acquiescence requires" also proof of active consent to the use by the trademark holder. *Kellog*, 209 F.3d at 568 (citing *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)).

Regardless of how liberally the Trading Post's argument is construed, there is no evidence in the record that the doctrine of laches or of acquiescence applies here. In considering the defense of laches, the following factors should be considered: "'(1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay.'" *Kellog*, 209 F.3d at 569 (quoting *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990)).

The Trading Post admits that the Chamber brought suit almost immediately after learning that the Trading Post was selling the shirts. *See* Pl. Resp. Br. at 20, ECF No. 19. The Trading Post argues that its "predecessor-in-interest [ACAD] had been selling Perchville merchandise since at least 2011." *Id.* This is utterly beside the point. To begin with, "[f]ailure to sue others does not constitute a laches defense." 3 *McCarthy on Trademarks and Unfair Competition* § 17:17 (5th ed.). Even if, when the Trading Post acquired ACAD, any laches defense which ACAD may have had was inherited by the Trading Post, there is no evidence in the record that the Chamber was aware of ACAD's infringing uses of the mark.

The Trading Post implicitly admits that this is true, but argues that the Chamber *should* have known that ACAD was using the mark. *See* Pl. Mot. Partial Summ. J. at 19. It is true that trademark holders have a duty to stay "aware of what is going on in [their] field." *Masck v. Sports Illustrated*, 5 F. Supp. 3d 881, 886 (E.D. Mich. 2014). But "although a trademark owner has a duty to police its rights against potential infringers, it is 'not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of [its] shotgun instantly upon spotting a possible infringer.'" *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1110–11 (N.D. Cal. 2008) (quoting *adidas America, Inc. v. Kmart Corp.*, 2006 WL 2044857, at *8 (D.Or. June 15, 2006)).

Here, there is no evidence that the Chamber was aware of ACAD's infringing use and no reasonable argument for why the Chamber should have known.[7] Even assuming that the Chamber had actual or constructive knowledge of ACAD's infringement, the delay in bringing suit was sufficiently reasonable as to avoid invalidating the Chamber's ability to vindicate its trademark rights. The statute of limitations for trademark cases in Michigan is three years. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321 (6th Cir. 2001). In the Sixth Circuit, "there is a strong presumption that a plaintiff's delay is reasonable so long as the analogous statute of limitations has not elapsed." *Elvis Presley Enterprises, Inc*, 936 F.2d at 894. Thus, assuming that the Chamber did not receive notice of the infringement by ACAD until 2013 (two years after the infringement began and three years before the Chamber sought an injunction against Agnello), the defense of laches would be inapposite here. And even if the Chamber received notice

---

[7] The Trading Post attempts to argue that the Chamber should have been aware of the infringing use because ACAD sold the merchandise "every year around festival time." Pl. Mot. Partial Summ. J. at 19. That assertion falls short of demonstrating constructive knowledge. There are undoubtedly many stores in the greater Tawas area. The Chamber necessarily has limited resources and has other responsibilities besides trademark enforcement. The Chamber cannot reasonably be faulted for not immediately spotting an infringing use by a local store and bringing suit.

immediately, the Trading Post would still bear the "stringent" burden of demonstrating that the delay in prosecuting ACAD was inexcusable. No such explanation or corroborating evidence has been provided. In short, there is simply no evidence to support a finding that the Chamber should be barred from enforcing its trademark rights against the Trading Post.

## IV.

The Trading Post's only remaining claims arise out of state law. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claims if they form part of the same controversy as the federal claim. *See* 28 U.S.C. § 1367(a).  A federal court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002).  However, the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor of remanding any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its

supplemental jurisdiction.  Plaintiffs' supplemental state law claims will therefore be remanded to state court.

## V.

Accordingly, it is **ORDERED** that the Trading Post's motion for summary judgment, ECF No. 13, is **DENIED.**

It is further **ORDERED** that Defendants' joint motions for summary judgment, ECF Nos, 14, 15, are **GRANTED in part.**

It is further **ORDERED** that Count I of the Complaint, ECF No. 1, is **DISMISSED with prejudice.**

It is further **ORDERED** that this case is **REMANDED** to the Twenty-Third Circuit Court of the State of Michigan, Iosco County.

Dated: March 13, 2018                                    s/Thomas L. Ludington
                                                         THOMAS L. LUDINGTON
                                                         United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 13, 2018.

                        s/Kelly Winslow
                        KELLY WINSLOW, Case Manager

---